MANUEL POLISHER AND LARRY WHITE
A/K/A LARRY WEISS *v.* STATE OF
MARYLAND

[No. 431, September Term, 1970.]

*Decided April 2, 1971.*

The cause was argued before MURPHY, C.J., and AN-
DERSON and ORTH, JJ.

*Joseph J. D'Erasmo* and *Victor L. Crawford,* with
whom were *H. Algire McFaul, Vivian V. Simpson,* and
*Joseph B. Simpson, Jr.,* on the brief, for appellants.

*Gilbert Rosenthal, Assistant Attorney General,* with
whom were *Francis B. Burch, Attorney General, William
A. Linthicum, Jr., State's Attorney for Montgomery
County,* and *Walter H. Madden, Assistant State's Attor-
ney for Montgomery County,* on the brief, for appellee.

ORTH, J., delivered the opinion of the Court.

The prosecutions in this case arose because money was
stolen. It was not taken by violence, but the means used
were more effective than if the victims were robbed at
gun point, because they were persuaded, in some cases,
time and time again, to come back to the thieves so more
money could be obtained. Those bilked were induced to
part not only with the possession of their money but with
the title to it as well. Therefore the crime was what is
commonly called "false pretenses." [1]

---

[1] We said in *Farlow v. State,* 9 Md. App. 515, 519:

"Generally speaking therefore, within the frame of ref-
erence of the taking, it is larceny if the taking is trespas-
sory. If the taking is not trespassory, it is false pretenses
when title to the goods as well as possession is obtained
by fraud; it is embezzlement if a servant or employee
fraudulently converts to his own use goods of his master
or employer which are in the possession of the servant or
employee; it is larceny after trust if a person entrusted
with the possession of goods for the purpose of applying
them for the use and benefit of the owner or person who
delivered them fraudulently converts them to his own
use."

The swindles involved the repair of automobiles.[2] In connection therewith Brunswick Exchange, Inc. (Brunswick), which traded under the names of Vanguard Auto Service and Vanguard Foreign Car Service (Vanguard), Manuel Polisher and Larry White, also known as Larry Weiss, were indicted. Brunswick was charged with two cases of obtaining money by a false pretense with intent to defraud—$481.71 from Charles Edward Walsh on 7 July 1969 under indictment 10634 and $302.80 from Lilian Miller on 10 September 1969 under indictment 10633. Polisher and White were jointly indicted, indictment 10681 charging them in the 1st count with the offense charged against Brunswick under indictment 10634 and in the 2nd count with conspiring together to commit that offense, and indictment 10682 charging them in the 1st count with the offense charged against Brunswick under indictment 10633 and in the 2nd count with conspiring together to commit that offense. The indictments were jointly tried at a bench trial in the Circuit Court for Montgomery County. The lower court granted motions for judgment of acquittal as to indictments 10633 and 10634 and as to the 2nd count in each of indictments 10681 and 10682. Polisher and White were each found guilty of the offense charged in the 1st count of indictments 10681 and 10682. Polisher was sentenced to 5 years on each conviction, the sentences to run consecutively. White was sentenced to 6 years on each conviction, the sentences to run concurrently. Each appeals from the judgments against him, and submits his own brief. Each, however, presents the same primary question: whether the evidence was sufficient to sustain his conviction. As argued by them the question goes both to the *corpus delicti* of the offense and the criminal agency and involves the admissibility of evidence relating to transactions with persons other than Charles Edward Walsh and Lilian Miller. Polisher, in addition, challenges certain rulings of the trial court, claiming prejudicial error.

2. We note that such a business is not subject to licensing, supervision or regulation by the State.

## THE MISDEMEANOR OF FALSE PRETENSES

The crime of "false pretenses" is simply stated in Code, Art. 27, § 140:

> "Any person who shall by any false pretense obtain from any other person any chattel, money or valuable security, with intent to defraud any person of the same, shall be guilty of a misdemeanor * * *." [3]

The false pretense is the crux of the crime. So the crime is committed when a person:

1) by making a false representation of a past or existing fact;
2) with intent to defraud; and
3) knowledge of its falsity;
4) obtains any chattel, money or valuable security from another;
5) who relies on the false representation;
6) to his detriment.

See *Smith v. State*, 237 Md. 573; *Tumminello v. State*, 10 Md. App. 612; *Lockard v. State*, 3 Md. App. 580; 2 Wharton's *Criminal Law* (Anderson) §§ 582-607, pp. 305-374; Perkins, *Criminal Law* (2d Ed.) pp. 296-321; Clark & Marshall, *Law of Crimes* (7th Ed.) §§ 12.23-12.27, pp. 921-944.

---

3. The statute contains two provisos not applicable in this case:
   (a) "* * * provided always, that if upon the trial of any person charged with such misdemeanor it shall be proved that he obtained the property in question in any such manner as to amount in law to larceny or robbery, he shall not by reason thereof be entitled to be acquitted of such misdemeanor; and no person tried upon such misdemeanor shall be afterwards liable for larceny or robbery upon the same facts: * * *"
   (b) "* * * and provided also, that a mere promise to be prosecuted for future payment, though not intended to be performed, shall not be sufficient to authorize a conviction under this section. * * *"

## THE INSTANT CASE

### The Miller Automobile

Mrs. Lillous Miller [4] testified that she owned a 1963 Chevy II which she took to Vanguard in Bethesda [5] on 9 September 1969 to have the transmission repaired; there was a noise underneath the car, "a kind of thud", which on two prior occasions shortly before Chevy Chase Chevrolet had not corrected. She told Chevy Chase Chevrolet: "If you can't find this and fix it, I will have to take it somewhere else because I can't live with this, there are parts obviously wearing." She looked in the Yellow Pages because she thought the problem was the transmission and Vanguard advertised that it repaired transmissions. She talked to appellant White. He rode in the car with her, said he would be able to fix it and arrangements were made to leave her car at Vanguard the next day. When she left the car she asked White to call her and let her know what he found. He telephoned and said "that they had checked out the transmission unit and found a bad crack in it and that the whole thing would have to be replaced." He estimated the cost as about $220. He said that the car also needed a front wheel alignment "and I was a little bit surprised about all that because I had just had my car worked on." White explained that Chevy Chase Chevrolet had not found the crack because "they probably were not equipped with the necessary things that would enable them to check this out. They are not transmission specialists and they probably could not have found it." Mrs. Miller said: "Well, I guess I am at your mercy. If there is a bad crack, I guess the part will have to be replaced." She picked up the car that afternoon and was tendered a bill for $302.80. Shocked at the amount, she asked White to justify it. He said: "We have done

---

4. She was designated as "Lilian Miller" in indictment 10682.

5. According to bills of Vanguard admitted in evidence there were "Vanguard Auto Service Centers" at 4865 Bethesda Ave., Bethesda, Md., 9443 Georgia Ave., Silver Spg., Md., and 1600 Benning Rod., N.E., Wash., D.C. "Vanguard Foreign Car Service" was at the Bethesda address.

all these things on the bill and also there was a leak in
your oil tank or whatever the container is and we fixed
the leak and filled it up with oil and that was not on the
bill but that was just extra." She paid him and drove
away. About a third of the way home she heard the thud
again. She went back to Vanguard immediately and told
White the defect had not been corrected. He said: "Well,
sometime these units come through with flaws. Will you
leave your car here and we will replace this unit with an-
other?" He offered to loan her a car to drive home de-
spite a sign proclaiming that they did not give "loaner
cars" and he then offered to get her a rental and pick up
the tab. Reluctant to drive an automobile with which she
was not familiar she agreed to bring her car back the
next day. She asked White to return her check but he
said it had already been processed and refused to give
it back. She told him she would stop payment on it and
did so the next day. She left her car at Vanguard the
next morning with the understanding that another new
transmission unit would be installed. She picked the car
up about 5:30 or 6:00 P.M. The bill was the same as be-
fore and she gave him another check payable to Van-
guard. The bill was received in evidence. The car did not
run properly; when she stopped at a light the motor
would die. "I became rather suspicious that he had been
meddling into the motor of the car. I didn't know what
the motor had to do with the transmission but it both-
ered me that I was having a new trouble." She went back
to Vanguard and complained to White. He said he would
check it out while she waited. He came back "with a little
metal part and he said, 'You see all this carbon on here?
That shouldn't be there.'" He told her that it had not
been put in right and that apparently Chevy Chase Chev-
rolet had done a bad job. She waited so he could "get
this little part back in" and then drove away. She had
the same trouble with the car. She had asked White to
show her the cracked transmission which he had re-
placed and he told her he would show it to her the next
day but he never did. She had also asked him to put her

car on a lift so she could see what he was talking about, but he said there was a car already on the lift. She never saw the badly cracked part. She went back a number of times in an effort to have the problem corrected to no avail and finally went to the Montgomery County Detective Bureau in October. As a result of that visit she took the car to B.C.C. Transmissions in Rockville where the car was put on a lift and examined.

Vincent Charles Scalamandre testified that he had been the owner of B.C.C. Transmissions in Rockville for 20 years. He specialized in automatic transmissions, handling the complete job, everything from removal to actual overhaul. He had personally worked on an average of 8 to 10 transmissions a week for the past 10 years and received training in three different schools. He said he had testified in courts of law as an expert witness with regard to automatic transmissions. He examined Mrs. Miller's car in his shop. The transmission was removed. He "disassembled" it on the bench and examined each and every part. It was his opinion that "the transmission wasn't out of the car since its original installation at the factory. * * * I say this because, from my experience, the car itself normally when they come through a factory they are undercoated and this was undercoated on all the bolts and the bolts had never been removed as far as my experience goes. * * * [N]ormally the bolts will get rusted and have sharp edges on them and the under-coating is a soft coating made of fiberous material and when you put a wrench on it it removes it." A color photograph of the frame of the car was received in evidence. It showed a bolt that would have to be removed to drop the transmission.

Detective Corporal Duncan R. Jerman of the Montgomery County Police testified that Mrs. Miller's car was examined by Scalamandre on 16 October 1969. William Ballman, a transmission specialist for B.C.C. Automatic Transmissions, qualified as an expert in the field of automatic transmissions. He took the transmission out of Mrs. Miller's car with Scalamandre and they dismantled

it. He inspected the parts. It was his opinion that the transmission had been in the car from the time it came from the factory. His opinion was based on the undercoating that was on the frame, bolts and from the grease that was on the front pump bolts. And it seemed to him that all the parts inside were original equipment. In short he was checking to see whether the transmission had been overhauled and he determined that it had not. He further testified that an "exchange transmission" was one that had been overhauled; "exchange transmission" and "overhaul transmission" meant the same thing. A "factory rebuilt transmission" was one rebuilt at "General Motors' factory." A "new factory transmission" was "just what it states, a new factory transmission." It would take about 6 months to get a new factory transmission.

The State adduced evidence through an employee of the bank at which Mrs. Miller had her checking account that a check made by her on 13 September 1969 in the amount of $302.80 payable to Vanguard Auto Service Center had been paid by the bank and debited to her account on 17 September 1969. The check was endorsed "For deposit only Vanguard Auto Service" and was stamped as received for deposit by American National Bank of Maryland on 16 September 1969.

*The Walsh Automobile*

Charles Edward Walsh testified that he owned a 1965 Mercedes-Benz. In January 1969 the car had automatic transmission trouble and he took it to Vanguard in Silver Spring. The shop foreman drove it and said he thought the trouble was in the torque converter. He left the car and the next day was told it had been taken to the Bethesda shop. The car was returned to him about 10 days later. The bill was $774.95 as shown by his check dated 31 January 1969 payable to "Vanguard" in that amount, endorsed "For deposit only Vanguard Auto Service" and stamped as received for deposit by American National Bank on 3 February 1969 and an invoice on a bill head

of Vanguard Foreign Car Service, 4865 Bethesda Avenue, Bethesda, Maryland dated 30 January 1969, each of which was received in evidence. The invoice, stamped "Paid", listed under parts a "Trans. (compl.) w/conv" in the amount of $645. The labor to replace it was $48.60 and there were additional charges for labor in connection with aligning and tightening the suspension for a total of $110.60. The invoice indicated that the door latch had been repaired and the car had been lubricated at no charge. Heavily outlined was a note headed "Important—bring the car back in 500 miles to have checked." While the car was in the shop Walsh had several conversations with White about the repairs and when the car would be ready. On one occasion White told Walsh that he was having trouble getting parts and that a new transmission housing was needed. When the car was ready, White gave Walsh the bill, and Walsh paid it. Two or three weeks later the transmission was leaking fluid and Walsh took the car back and told White who asked that the car be left over night. The next day White said a small seal causing the leak had been replaced. Within a month the transmission again leaked fluid and Walsh talked to White who said to bring the car in but not to add any fluid. It was left at Vanguard over night. In March 1969 he took the car to a shop to have body work done and Vanguard picked it up there to reset the valves which, it seems, White had indicated should be done. The bill was for $342.67 and was paid by check to Vanguard on 1 April 1969. In May the car again leaked transmission fluid and Vanguard "rechecked previous repairs and adjusted as required" at no charge as shown by an invoice dated 19 May 1969. There was a charge thereon for parts and labor with respect to an oil change and blowing out the gas line in the amount of $30.96. In July the motor was heating up. Walsh looked under the hood and saw that a blade of the radiator fan was missing. He called White who told him not to continue to drive the car that way and to bring it over. This resulted in a bill dated 7 July 1969 on a Vanguard Auto Service bill head in the

amount of $448.71—parts $281.44 and labor $156. The parts included a water pump, a generator, a fan motor mount, "P-call Pistons" and "P-disks". It was paid by check given to White, payable to Vanguard, endorsed "For deposit only Vanguard Auto Service" and received for deposit by American National Bank on 9 July 1969. The bill and check were received in evidence. Walsh had only taken the car in to have a fan blade replaced and asked White about the size of the bill. White told Walsh that "one thing they had to do was shift the motor forward and put in new motor mounts". White told him new motor mounts and a new generator had been installed. This surprised Walsh because he had never had generator trouble. In late September or October 1969 Walsh's wife had trouble while driving the car. She got it to a filling station. The transmission had dropped down from the driveshaft. Walsh called White and the car was towed to Vanguard. White said he would get parts for it and have it ready in a few days. After a few days Walsh called White and was told the car was in their shop at 1600 Benning Road. Ten days later Walsh went to the Benning Road shop and the foreman said they were trying to get parts. Ten days later Walsh called White and again was told they were awaiting parts. Walsh waited 4 weeks and the car was still outside the Benning Road shop untouched. White said their Mercedes man was not working for them any more but they were doing their best to get it repaired. Two days later Walsh asked White "if he could get his boss * * * to let me take the car to McNey Motors and have it repaired." White told him he was going to get in touch with his boss and see if they could let him take the car to McNey for repairs. He finally took it to McNey Motors. From January 1969 to the time the car was taken to McNey no one other than Vanguard had done any mechanical work on the car. During that time Walsh had been back to Vanguard "a total of nine times with trouble with the transmission and had paid Vanguard about $1600 for work allegedly done on the car. On cross-examination of Walsh it was elicited

that the car was satisfactorily repaired by McNey and that the cost was $699 of which Walsh paid $98 and Vanguard paid $601. He had gotten in touch with the Montgomery County Police when his car had been sitting on the Vanguard lot at Benning Road about three weeks. During Walsh's conversation with White about taking the car to McNey Motors White said Vanguard would take care of the cost of the repairs by McNey. Apparently the $98 paid by Walsh was for work in addition to that done on the transmission. Their estimate for the transmission repair was $618. Walsh said: "I talked to Mr. Polisher by phone and he said he could get the parts more reasonable than that but he would talk to someone at McNey and see if they couldn't come to an agreement." That was the first time he had any contact with Polisher.

Robert Sterling Mosier testified that he had worked for Vanguard in Bethesda from the second week in June until about the third week in August 1969 as an automobile mechanic. He had answered an advertisement in the paper for the Benning Road shop. The service manager there said he did not need anyone but called the Bethesda shop and sent him there to see White who interviewed him and gave him a job. "Mr. White trained me for whatever I was trained for. * * * The first day that I went to work there, at first I wanted to look around the shop and look at the machines and everything and make sure of their uses. Mr. White told me I didn't have to do that because they never use any of the machines, the distributor tester and wheel alignment and so on. Later he gave me a new paint brush. * * * He said, 'Keep this, don't lose this, this is going to be the most important tool you are going to have to work with here.' I didn't know what he meant. I was kind of impressed because I thought it was going to be real good shop work, everything you did was real clean and done correctly. It wasn't long before I found out what he meant by the brush was going to be the most important tool I would work here with." Mosier was working for Vanguard on 7 July 1969 and had worked on Walsh's car on that date. The invoice of

7 July in the amount of $448.71 paid by Walsh was shown to him by the State. He said he had replaced the broken fan. "Mr. White told me to clean the water pump to make it look like I had replaced it. He told me to do the same with the motor mounts and paint them and make them look like they had been replaced.[6] * * * When he looked at them after I had cleaned them, he told me he wanted me to take a can of black spray paint and spray them black because the way they were they didn't look like new and he wanted them to look like new." He did not replace the motor mounts, he did not replace the generator, he did not replace the water pump, he did not overhaul the brakes, he did not replace the front brake pads, he did not overhaul the front callipers, he did not replace the front disks, although a charge for all these things, parts and labor, were on the bill presented to Walsh by White and paid by Walsh. He simply replaced the fan blade which took about an hour. For work actually rendered and parts actually supplied the cost was only $20 of the $448.71 charged.

*The Scheme or Plan*

*The Nesbitt Car*

Mosier said he knew Manuel Polisher from his association with Vanguard. One day when White was out Polisher was "in charge of running the [Bethesda] shop." A Spitfire Mark II was brought in by Barbara Nesbitt about noon. The complaint was that the muffler was rattling and the clutch was bad. "Mr. Polisher instructed me to put the car up on the rack and raise it up and we were going to go over and take a look at it. While we were underneath it he stated * * * that they had put a muffler on it down at the Benning Road shop and that the muffler was rattling and she wanted us to take a look

---

6. The motor mounts were cleaned with varsol and the brush which he had been told by White was "the most important tool" he had to work with. "The reason was most of the work we were going to do was going to be just make it look like work had been done. This was just by cleaning parts instead of actually doing the work of replacing them or adjusting them or whatever."

at it. While there he also said that she needed a clutch on the car and that he had already gotten her down at Benning Road with another of their cars and that he wanted to make sure that this car got worked on here. Barbara's mother [who apparently had brought the car in] wasn't there at the time, so we let the car down and took it off the rack. Later that day when she got there Mr. Polisher told me to look at the clutch and I said from driving it that the clutch was bad and he said, 'Can you change the clutch by the time we close today?' It was only about an hour and a half left and I said, 'No, I can't get the thing changed in an hour and a half.' He said, 'Get the thing torn apart enough that the car cannot leave here tonight. I want to make sure that this car stays for Larry [White] to take care of the ticket.' I took the transmission out and by that time it was about time to go home." Barbara's mother had asked Polisher what he was doing at the Bethesda shop. "He said that he owns and operates all three Vanguard shops; that he is in charge of all three of them, the running of them." She said she had taken another Spitfire to the Benning Road shop for a clutch and Polisher had taken care of it and the bill just for the clutch was around $300. Earlier that day Polisher was giving Mosier instructions on a car being worked on and Mosier started to tell Polisher what White had told him. Polisher said: "I don't care what Larry says, Larry doesn't know anything about cars. I am the one that knows about cars here. Larry is here to sell customers and sell them whatever he wants to and that is all he is here for." The next day Mosier received instructions from White about the Nesbitt car. "I put in a rebuilt clutch, clutch plate and a throw out bearing and steam cleaned the transmission like Mr. White told me to do, painted it black and stuck it back in the car. Later that day Barbara's mother came to pick up the car and Mr. White instructed me to drive the Spitfire and follow her mother to where Barbara worked to drop off the car." Mosier asked Barbara's mother to let him see the bill. "It was something like $250 and there were a

number of things on it that I hadn't done, like $80's worth of transmission parts and labor on working on the transmission. I told her that." No labor had been performed or parts supplied for the transmission.

*The Flumerfelt Car*

Shortly after Mosier started to work at Vanguard, White gave him a repair order on a 1968 Volvo on which was designated, among other things, that it was to be lubricated. Mosier went to White and said, "You have got to be kidding. Volvo's don't have lubrication joints. How can you do that?" White said, "They don't have lubrication joints?" Mosier replied, "No, they don't. That is one of their biggest things that you never have to lubricate a Volvo. There is nothing to lubricate on it." White left the lubrication on the bill and charged the customer for lubricating the Volvo. The invoice for this work on Vanguard Auto Service Centers bill head, dated 23 June 1969, to M. Flumerfelt, was in a total amount of $253.17 and was stamped as paid the same date. The only work performed on the car was a minor tune-up and the changing of two inner door handles on the left side of the car, the one on the back door being placed on the front door and vice versa. This work represented about $25 of the total bill. Of a total of $120.97 charged for parts, only about $9.20 for spark plugs, points and a condensor were actually placed in the car. The total charge for labor was $127.90. Charges for labor that was never performed included lubrication $3.75, time adjustment $14.25, air-conditioning unit $31.90, overhauling the air-conditioning compressor $48.60, evacuating the air-conditioning system, $18.00.

The owner of the Volvo, Mary Flumerfelt, said she had paid the bill of 23 June 1969 in the amount of $253.17 and her check therefor had been paid by the bank. The first time she took her car to Vanguard was in 1968 when she asked for a 10,000 mile inspection. She told White she wanted done the routine work recommended by Volvo at that mileage. She was presented a bill by White on

Vanguard Foreign Car Service bill head, dated 29 July 1968 in the amount of $80.40 and paid it the same date. Her check cleared the bank. On 29 August 1968 she took the car to Vanguard for a 12,000 mile checkup and paid a bill as presented by White in the amount of $193.92. On 18 December 1968 Vanguard was to give the car a 15,000 mile checkup. Again she talked to White about what was to be done. In addition to the checkup she requested a new window frame to replace one that had been broken. The bill was $103.46 and was paid by her. In March 1969 she hit a pothole causing a short in the horn which she had to disconnect to stop it from blowing. She went to Vanguard and told White to fix the horn. Then she got calls telling her the master brake cylinder had cracked and had to be replaced, that the steering gear box was shattered and had to be replaced and that the car was unsafe to drive. This information did not come from White, the person calling saying that White was not there. The bill, dated 13 March 1969 but stamped as paid on 12 March 1969 was for $357.07. She next took the car to Vanguard on 23 June 1969 for the 18,000 mile inspection and the bill about which Mosier testified as summarized *supra,* was for $253.17. Two days later she took the car back to Vanguard and talked to White. She had difficulty starting the car and taking off in first gear and the motor was very rough and cut out when she would stop at a stop sign. White told her he would take care of it. "During that day he called me sounding very distressed and sympathetic and said that the trouble was in the transmission with the gears." She questioned that because she thought he had already fixed the gears. He said that it was the steering gear box they had fixed before. She was upset at the price he quoted and he said he would ask the mechanic to give a discount on the labor. He called back and said the mechanic had agreed to give a $30 discount. "Mr. White at that time assured me that when this work was done my car would be in perfect condition, that there was nothing else that could go wrong and that he would give his personal guarantee that I should

not have another thing done on this car for at least 10,000 miles. He said to me that he thought the problem was the Volvo people using cheap Greek labor, too." The bill presented to her by White and paid by her by check to the order of Vanguard was for $385.76. When she got her car from Vanguard on 25 June 1969 the trouble had not been corrected. She did not take it back; "I thought I had learned my lesson."

The bills of 29 June 1968, 29 August 1968, 18 December 1968, and 13 March 1969 indicated that the work had been done by "AM." This was Americo De Les Casas, 28 years of age, who had started working as a mechanic in Peru when 13 years old. His first job in the United States was with Vanguard; he answered an ad. He worked there 18 months, starting the latter part of 1967. He testified about the bill of 29 July 1968. He said he had worked on that car. Of the charges on the bill, he changed the oil and filter, parts $8.20, labor $3.75, tightened the exhaust system, labor $10.80, and tightened the sun visor at no charge. There were other charges for labor—tightening the front suspension, $15.00; adjusting the steering, $13.60; tightening the rear suspension, $7.-80; adjusting and testing valves, $12.00; synchronized the carburetor and adjusting the points, $9.00—none of this was done. Similarly his testimony tended to show that only a small fraction of the charges on the bills of 29 August 1968, 18 December 1968, 13 March 1969 represented parts used and labor performed. For example on the bill of 13 March 1969, which amounted to $357.07, the only work done was on the horn and turn signal — $30 labor and about $1.20 parts. On cross-examination he concisely stated White's attitude, "He don't have any consideration at all. * * * He didn't give a damn about all the people."

The voucher of 25 June 1969 indicated that the work was done by "Dick." This was Richard Thomas Wettrich who had been employed by Vanguard in Bethesda as a general mechanic about May 1969 and remained four or five months. He had worked on Mary Flumerfelt's Volvo

at White's direction. White told him to road test the car to see if there was anything wrong with the clutch or transmission. As a result he told White it was only necessary to clean and adjust the clutch which is what he did. He again road tested it and it was all right. The bill presented to Mary Flumerfelt included labor for overhauling the transmission, $110 which was not done and labor for replacing the clutch, release bearing and flywheel, $24.40, which was not done. It also charged for parts which were not put in the car, for example: $61.40 for a clutch assembly; $8.05 for a release bearing; $19.70 for transmission bearing; $6.40 for a main shaft; $42.21 for a synchro assembly; $33.15 for a first gear. The total bill was $385.76. Wettrich said that a true bill would have been for a half hour labor and no parts.

## The Adessa Car

John Louis Adessa owned a 1960 Jaguar Sedan. In July 1969 he took it to Vanguard in Bethesda and spoke to White who gave him an estimate of $250 on a valve job. It was the best of three estimates he had received so the car was taken to the Vanguard shop. A week later he called White who told him that the head was cracked and would cost an additional $400. He told White he did not have the money and White said it was up to him whether he wanted to see if he could get the money. Adessa tried to get a loan and could get one for $300. When he called White he was told that Vanguard accepted Bank Americard and since his girl had that card they decided to charge the additional on the credit card. Even though he was not knowledgeable about cars, when he went to get the car he saw that they had not replaced the head. White told him they had been able to repair the head rather than replace it. The bill dated 8 July 1969 on Vanguard Auto Service Centers bill head was $754.94, and was paid $300 in cash and $454.94 by the credit card of his girl friend Donna Helms. The car did not run well. "[T]hey said that when a new valve job was done that the valves would clack and it would have problems running for the

first few days until it worked itself in." Adessa went on a trip, leaving the car with his father, although it "wasn't hardly running at all." It stopped running and his mother called Vanguard to come and get it. She was informed it would be ready in two weeks. At the end of that period Adessa called Vanguard and was told it would be ready the next week. At the end of that week he was told it would take another two weeks. When those two weeks passed he called Vanguard again and talked to White who said they were having a strike "up at Rensaleer, the main Jaguar Dealer in New York and it was impossible to get a cam." White said if the car was not ready in another week he would loan him a car. He picked up a car at Econo-Car the end of August and drove it until the middle of November as his car was still in the shop. White telling him from time to time that it would be ready in a week or two. During that period the car he was using had a brake failure and "I asked if I had the brakes fixed if they would reimburse me for it. They said, 'Yes.' " But when he presented the bill Vanguard would not pay it, saying they would give him the money back when they gave him his car back. The middle of November White gave him his car keys and told him to get his car. The car started but would not move. He asked White what the problem was. "He said I had a bad clutch and it must have gone out in the time he told me had had driven the car himself over the week." He said: "[T]he clutch hadn't been too good. Evidently from the time he quit driving the car until I tried to pick it up, which was a couple days later, it had gone out completely." Adessa said that the clutch had not been bad when he brought the car in. White said they would fix the clutch for $180. Adessa said he was broke and White said to go home and think about it. Later White said he would fix the clutch for $80 and throw out the labor. Adessa said he still did not have the money and White hung up. Adessa called him back and told him that he had retained an attorney. White said the car was ready, that he had put a new clutch in free. "He said he realized I had spent so much

on the car that he decided to give me the clutch." He got the car the middle of December. It ran but not good. From the time he first took it to Vanguard until the middle of December no one else had worked on it.

Wettrich had worked on the Adessa Jaguar. White told him to find out what was wrong with the car. "I took a compression check and I found out that the cylinder next to the fire wall had less than thirty pounds compression and I told Mr. White it was either a burned valve or a piston, or both or a head gasket." White said he would get in touch with the customer. Later that day White told Wettrich to take off the head. When this was done it was seen that there were some bad valves. Vanguard was not equipped to grind valves on a Jaguar, so it was taken to H. & D. Machining. "All I did was to take the cylinder head off and put the cylinder head back on the car, nothing else." When he started the car he noticed a miss. He took the spark plugs out and ran a wet compression check and got no compression on the number one cylinder. He put the spark plugs back and took a compression check and obtained the same result. He told White who said, "Let's take a ride around the block." They rode around the block. White said, "Fuck the customer, we've got his money and he's going to New York." Wettrich asked White what he was going to do and White said, "He's going to pick the car up. Don't worry about it. I will worry about it." On the bill of 8 July 1969 the charge for parts was $451.39. Wettrich only put in a gasket set costing $23.77. He did not know what H. & D. Machining charged for the valve job but he estimated a fair cost to a customer for parts and labor would be $125. A few minutes after Adessa paid the bill an employee of Vanguard who worked in the parts department asked Wettrich if he had just overhauled a Jaguar. Wettrich said he had not. White came up (it was near quitting time) and asked what Wettrich and the parts man had been talking about. "I told him he asked me if I just overhauled the engine and put in pistons and all that and I told him no." The next morning Wettrich asked White

where the parts man was and White said he had been fired. Adessa brought the car back. Oil was pouring out of the front tappet cover. A test showed no compression in the number one cylinder as before. The car was still sitting in the shop when Wettrich quit Vanguard in September 1969.

*The Shaffer Car*

George W. Shaffer, an attorney, owned a 1966 Volkswagen. In March 1969 he was having difficulty with the car and took it to Vanguard in Bethesda. He talked to White "who was at the service desk as you walk in." He left the car and asked White to call him after he had looked at it. White called him and said there had been trouble in that particular model with the "transaxle." Shaffer asked what a transaxle was and White said it was "something in the back part of a Volkswagen." It would cost around $200 or $300 to repair because he was not sure whether they would put in a new or rebuilt one. White said other things would be needed and the bill would be about $500. Shaffer said he would have to think it over. He called his wife and they decided not to have Vanguard do the work; they had only paid $500 for the car. He called White and told him. White said the bill was already $100. Shaffer asked what for and White said, "Well, we have already torn it down to take a look at it, that is $50 and it will cost another $50 to get it back in." So Shaffer "reluctantly" told him to do the work. The bill was $568.87. Shaffer was very upset but White assured him that the car was in tip-top shape and that there would be no more trouble with it. When Shaffer drove the car home that night "the same problem that had occurred the day before I took the car in was still occurring." He called White, took the car in, White came back in a few minutes, said it only took a little screwdriver to fix it and Shaffer drove off. The same trouble persisted until finally the car stopped completely and Shaffer took it back to Vanguard. White said, "It just took a little bit more here and there to set the car right."

But it seemed there were problems not included in the first job and Shaffer was billed $35 on 11 November 1969. The car broke down on Connecticut Avenue. He took it to Vanguard and this time paid $38.65 after being presented with a bill of $69.60. Two things resulted in the reduction, "my protestations and Mr. White's crossing out" of items listed. Shaffer had no further dealings with Vanguard.

Lothar Schuettler was employed as a mechanic for Vanguard in the Bethesda shop from August 1968 to March 1969. He had attended a school for mechanics in Germany for three and a half years and had thirteen years experience. He had worked on Shaffer's VW. When the car was brought in on 14 March 1969 White directed him to "check the front brakes and put the brake drums down and look at the brakes, and then I replaced the brake shoes and make the engine tune-up on the engine, put new spark plugs in and set the tuning and later on we put on half axle what was coming from a junk yard. * * * I painted it and we put it in this car." He did not replace the clutch as the bill showed. Nor did he, as the bill charged, overhaul the carburetor. White said, "Just use 2 plus 2 and clean the carburetor on the outside. We don't overhaul carburetors at all." As to the charge of $24.40 for "desludging" the engine, Schuettler did not know what "desludging" an engine was. Whatever was meant by it, such work was not done. As for parts, White charged $285 for the junk yard transaxle. The clutch assembly for $25.20 was not put in the car and in fact the only parts used were the car brake shoes, spark plugs, points, condensor and oil and valve cover gaskets. Schuettler left Vanguard "[b]ecause I wouldn't like to stay anymore there and do that and every time we have people coming back and complaining about work that has never been done. You can't do this, you can't charge customers for work that has never been done. I had a feeling. I was hoping other places would be different because it was my first experience here in the United States."

## The Charen Car

Thelma Charen, a medical librarian, owned a 1963 Lincoln convertible. She took it to the Bethesda Vanguard shop in June 1969 to have the automatically operated window on the driver's side repaired; it would go down but would not go up. She spoke to White and left it for repair. When she returned to get it White told her it needed a new window motor. The bill he gave her dated 24 June 1969 on Vanguard Auto Service Center bill head was for $78.68. The parts were listed as a window motor $44.65 and harness $13.70. The labor for replacing the motor, repairing the wiring and repairing the regulator was $18.00.

White had directed Wettrich to find out why the window would not operate. "I took the door handle off and checked to see if the motor was working. It was working and I adjusted the window track and the motor worked and I put it up to try the window and told him it was an adjustment on the track, no parts were used." "Approximately between a half hour and one hour at the most" was required to fix the window. The motor was not installed nor was the harness.

## The Top Mechanic

The nature of the operation at the Vanguard Bethesda shop was indicated by the term "top mechanic." The mechanics who worked there understood that it referred to the steam cleaning apparatus. Mosier said: "The reason was because the steam cleaner made more money than anybody else there because we would use — Mr. White would tell us to use the cleaner to clean transmissions, engines or front ends, most anything that had anything to be cleaned off so he could charge somebody for rebuilding or new, whatever it was we steam cleaned. That way the steam cleaner made all kinds of money." Schuettler explained that it was used to clean parts so the customer could be charged for a new part. Another mechanic, Elfred J. Duehr, testified that he used the cleaner "in the

beginning, but later on refused to use it, because I thought it was not right." [7]

A product called 2 plus 2 carburetor cleaner was used to like purpose. White told Mosier to use it to clean carburetors to make them look like they had been overhauled. Once Schuettler had rebuilt a carburetor for a VW. "I removed the carburetor out of the car and picked up a repair kit for the carburetor in parts department, put the repair kit into the carburetor and put the carburetor back in the car." White told him, "Don't do this anymore. * * * We have 2 plus 2. Clean the carburetor from the outside and that is it. This is all you have to do with the carburetor." Schuettler never rebuilt a carburetor at Vanguard after that. When he worked on carburetors he "just cleaned them with 2 plus 2." White told Americo De Les Casas how to use 2 plus 2 to make a carburetor "look like it was a new one." Varsol and a paint brush were also extensively used to give a new appearance to old parts. Wettrich gave an example of their use. "For cleaning tie rod ends or seals around axles or around brakes, making them look like the brakes were overhauled or steering boxes were replaced or overhauled, which they weren't."

## THE APPLICATION OF THE LAW TO THE FACTS

### The Convictions of Larry White

#### Indictment 10682

We think it clear that the evidence before the court was sufficient in law to sustain the conviction of White for false pretenses as to Lilian (or Lillous) Miller.

The rendering by him of a bill which designated labor as performed when it had not been and parts as supplied when they had not been was itself the making of a false representation of a material past fact. "The false representation or pretense may be made in any form or man-

---

7. There was testimony that in March 1969 the steam cleaner broke down. "Mr. White was really nervous. He called the company that was fixing the steam cleaner and he brought right away another one and take the old one and repaired it * * *."

ner. It may be made by words, or conduct that has the effect of misrepresenting existing facts to the victim. * * * The false representation may be made in writing, orally or by telephone. * * * It is immaterial that the false representation was ambiguous, when the intent and reasonable effect of defendant's conduct was to mislead the victim." 2 Wharton's *Criminal Law, supra,* § 585, pp. 311-315. It is not disputed that money was obtained from Mrs. Miller, and that she relied on the false representation to her detriment. However, White claims that (1) the proof failed to show that *he* had obtained something of value from Mrs. Miller, or (2) that he had knowledge that the representation was false.

### (1)

The argument that the evidence did not establish that White obtained a chattel or money or a valuable security from Mrs. Miller is predicated upon the fact that the check given by her in payment of the bill rendered was payable to Vanguard and the proceeds deposited in its account. White argues that it was not demonstrated that he received any portion of the proceeds of that check. He urges: "If anyone can be said to have obtained anything of value from the alleged victims, it was Brunswick Exchange, Inc., trading as Vanguard Auto Service Center * * *. Mr. Weiss [White] was merely an employee of Brunswick Exchange, Inc. In short there is no evidence to prove that [White] obtained anything of value by means of any false pretense."

The argument fails because "[t]here is no doctrine of *lucri causa* in the field of false pretenses. It is accordingly immaterial that the defendant did not gain or intend to gain any personal benefit or advantage from obtaining the property from the victim." *Id.,* § 583, p. 309. "[T]he defendant is responsible for his false pretense even though he did not personally gain any benefit from the goods which had been obtained thereby." *Id.,* § 585, p. 316. It is stated in Hochheimer, *Criminal Law* (2nd Ed. 1904), § 323, p. 356: "It is sufficient that the thing has

been confided to the offender, it being immaterial that he did not obtain it on his own account, nor for his own gain or benefit." 35 C.J.S., False Pretenses, § 25, p. 845, says: "The property need not be delivered to accused himself; it is sufficient if it is obtained by another on his account." See *Levy v. State,* 225 Md. 201; *Simmons v. State,* 165 Md. 155. C.J.S. continues: "Further, the property need not be obtained by accused for himself, it being sufficient, if, as a result of his false representations, it is delivered either for the benefit of accused or for another's benefit." [8]

## (2)

The argument that White did not know that the transmission had not been replaced is utterly without merit. The requirement of knowledge is not limited to knowledge in the true sense. "If the representation is really untrue this part of the requirement is satisfied if it is made by one who *knows* it is untrue, or believes it is untrue, or is quite aware that he has not the slightest notion whether it is true or not." Perkins, *Criminal Law, supra,* p. 263. In this context, that White had knowledge that the transmission had not been replaced in the Miller car was a rational inference. That he did not have such knowledge, in the light of his telephone conversations, his refusal to show her the cracked transmission, her bringing the car back immediately with the complaint that "thud" was still present, her subsequent complaints and all the evidence of the way the shop was operated completely taxes credulity.

We hold that the lower court was not clearly erroneous in its judgment on the evidence that White obtained money from Mrs. Miller by a false pretense. Maryland Rule 1086; *Williams v. State,* 5 Md. App. 450.

8. To like effect see: *Montana v. Lagerquist,* 445 P. 2d 910, 916 (Mont. 1968); *Idaho v. Urie,* 437 P. 2d 24, 26 (Idaho, 1968); *Maine v. Deschambault,* 191 A. 2d 114, 118 (Me. 1963); *People v. Andrews,* 332 P. 2d 408, 415 (Cal. 1958); *Ownbey v. State,* 253 S.W.2d 726, 727 (Tenn. 1952); *Kemp v. State,* 6 S.E.2d 196, 197 (Ga. 1939); *State v. Reysa,* 199 N.W. 1000, 1004 (Iowa, 1924); *People v. Woods,* 212 P. 41, 42 (Cal. 1922).

*Indictment 10681*

We think it clear that the evidence before the court was sufficient in law to sustain the conviction of White for false pretenses as to Charles Edward Walsh.

White claims, as he did in the case of the Miller car, that it was not proved that he obtained something of value from Walsh, the checks being payable to and endorsed by Vanguard. But as above stated, that the false pretense is made for the benefit of another, and not for the accused will not relieve him of criminal liability. It was not material that the money obtained from Walsh was not shown to have been appropriated by White.

White also claims that the only evidence of White's "guilty knowledge" of the Walsh transaction came from Mosier and Walsh. He asserts that as Mosier was an accomplice his evidence had to be corroborated. He contends that it was not.

Apparently what White is contending is that the only proof that the representations made by the bills given by White to Walsh were false was by the uncorroborated testimony of the accomplice Mosier. If the evidence was sufficient to establish that the work and parts for which Walsh was charged by White were not performed and furnished respectively, then it was sufficient to prove, in the circumstances, that White had "knowledge" of the false representations. For, as we above stated, if the representation was untrue White would have "knowledge" if he actually knew it to be untrue or if he believed it to be untrue or if he was aware that he did not know whether it was true or not. At the very least the evidence here permitted a rational inference that White was quite aware that he did not have the slightest notion whether the work charged Walsh as performed and the parts charged him as supplied had in fact been performed and supplied; therefore he had knowledge that the bill was untrue and made a false representation by presenting it for payment. So the question is whether the evidence was sufficient to show that the work was not done and that the parts were not furnished.

We believe that Mosier was an accomplice. He admitted that he "actually knew" that he was "helping to cheat" the customers and that he participated in it, at least to the extent that "I did the work that I was told to and got paid for working as Mr. White told me to." He knew the work he was doing "was being overcharged to the customers." It was for that reason he quit his job. We think he was culpably implicated in or unlawfully cooperated, aided or abetted in the commission of the crime charged. *Coleman v. State,* 209 Md. 379, 385; *Burley v. State,* 5 Md. App. 469, 472. See *Sutton v. State,* 10 Md. App. 353.

The only direct evidence that the Walsh car had not been repaired as represented was by the testimony of Mosier. But even though he was an accomplice it was not necessary that every particular of his testimony be corroborated. Not much in the way of corroboration is required; it is not necessary in and of itself for the corroborative evidence to be sufficient to convict. *Wright v. State,* 219 Md. 643, 650. The rule in this State is that the accomplice's testimony must be corroborated as to some of the material facts tending to show that the accused was either identified with the perpetrators of the crime or had participated in the commission of the crime itself. *Boone v. State,* 3 Md. App. 11, 19-20, and note 4 thereof. We feel that White's entire course of conduct as disclosed by the testimony of Walsh and considered in the light of the testimony of Lillous Miller, Mary Flumerfelt, John Adessa and George Shaffer tended to show White's participation in the offense of false pretenses as charged. And the history of the trouble with the car after it was supposedly repaired, as recounted by Walsh, as well as the fact that Vanguard paid McNey Motors $601 for repairs to the transmission, tended to corroborate that it had not been repaired by Vanguard as represented. We find that the evidence was sufficient in law to establish that White had "the guilty knowledge with respect to the Walsh vehicle prerequisite to a finding of an intent to defraud."

We hold that the court was not clearly erroneous in its judgment on the evidence that White obtained money from Walsh by a false pretense.

*The Admissibility of Evidence of Other Transactions*

White claims error in the admission of the evidence with respect to transactions involving cars other than those of Miller and Walsh. The question basic to this contention was before us in *Gordon v. State,* 5 Md. App. 291. We said, at 306:

> "The general rule is that 'when a man is put upon trial for one offense, he is to be convicted, if at all, by evidence which shows that he is guilty of that offense alone, and that, under ordinary circumstances, proof of his guilt of one or a score of other offenses in his lifetime is wholly exluded.' *Wentz v. State,* 159 Md. 161, 164. The rule is not, however, without exceptions and evidence of other crimes of the same character is generally allowed when it tends to show the guilty knowledge of the offense for which the defendant was indicted, or of other offenses so connected that they form parts of one entire scheme or transaction from which may be gathered the purpose or intent with which the act was done for which the accused was then being tried. *Meno v. State,* 117 Md. 435. As more particularly crystalized in *Cothron v. State,* 138 Md. 101, 110, the rule is that evidence of other crimes is admissible to prove the specific crime charged when such evidence tends to establish (1) motive, (2) intent, (3) absence of mistake or accident, (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the other, and (5) the identity of the person charged with the commission of the crime on trial. To like effect, see *Jones v. State,* 4 Md. App. 445; *Thomas v.*

*State,* 3 Md. App. 708; *Gilchrist v. State,* 2 Md. App. 635; *Loker v. State,* 2 Md. App. 1; *Gorski v. State,* 1 Md. App. 200."

We see no error in the admission of the challenged evidence. Evidence of other transactions tended to establish all of the five matters on which the exception to the general rule is predicated and certainly that of a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the other. It clearly tended to show such matters rather than simply to indicate a disposition on the part of White to commit crime or merely to signify that he had a "propensity" to commit similar crimes. See *Wethington v. State,* 3 Md. App. 237, 240-241.

White urges that before the State can introduce evidence of other transactions it "must first have demonstrated that there is a *prima facie* evidence of the defendant's guilt of the offenses charged in the information or indictment." He relies on *MacEwen v. State,* 194 Md. 492. We do not construe *MacEwen* quite the way he does. The Court there said, at 502: "The law does not permit the proof of any such extraneous matter until the State has offered evidence which shows *prima facie* guilt. If the extraneous matter explains the actions and movements of the prisoner both before and after the commission of the crime charged, it is relevant, even though the extraneous matter involves the commission of another crime * * *." This does not mean that the State must first establish *prima facie* every element of the crime charged, for it is the evidence of other offenses which may prove some of the elements of the crime charged. So in *MacEwen* where the charge was false pretenses, the Court made clear that it was competent for the State to offer such extraneous matter, "bearing on the question of intent," when it had made out a *prima facie* case of guilt that the traverser had obtained money as charged.[9]

---

9. However, under the circumstances and proof in *MacEwen* the general rule and not the exception thereto applied. At p. 503.

In the instant case the State had offered evidence that money had been obtained by White as charged from Mrs. Miller, that the transmission represented by White to have been replaced in her car had not been replaced, that Walsh had paid bills tendered by White, that the car did not operate properly after the repairs were alleged to have been made, and that McNey Motors finally had to repair it, the substantial part of their bill being paid by Vanguard, before evidence of the other transactions were offered.[10] We hold that under the circumstances and proof of this case the exception to the general rule applies and evidence regarding the other transactions was admissible.

We observe that we find no error in the admission of evidence relating to the "top mechanic," the 2 plus 2 carburetor cleaner, the varsol and the paint brush. This evidence did not tend to show the commission of a specific prior offense and thus was not within the ambit of the general rule but it was relevant to the question of knowledge of the bills presented by White and his intent to defraud with respect to both the offenses of which he was convicted and the collateral offenses and was properly admissible.

White and Polisher filed demand for particulars as to indictment 10681 and 10682. White alleges in his brief that in the State's answer thereto there was no reference to any alleged offenses other than those charged in the indictments. The answers to the demands are not included in the record before us [11] but the docket entries show that answers were filed in criminals 10633 and 10634. The docket entries also disclose that White and Polisher excepted to the answers, that there was a hearing thereon, and that the State was required to improve

---

10. It is not necessary that the collateral offenses be proved beyond a reasonable doubt. The other offense must be shown with reasonable certainty or substantially shown or as sometimes stated, there must be evidence tending to prove the elements of the collateral crime or the proof of the other offense must be clear. 1 Wharton's *Criminal Evidence*, (12th Ed.), § 247.

11. See Maryland Rule 1027.

answers to nos. 5 and 6, whatever they may have been. White, adopting the argument set out in Polisher's brief, contends that evidence of the collateral offenses was not admissible because particulars as to them were not given.

Rule 715 b provides: "Where the offense charged is false pretenses, the State's Attorney shall, upon demand of the defendant, file a bill of particulars within a reasonable time." See subsection c as to objection to a bill of particulars and subsection d as to amendment of it. No sanction is prescribed by the Rule for failure to comply with it. Nor do we feel that the Rule contemplates that the State particularize all the evidence it may offer. See *Cropper v. State*, 233 Md. 384. In any event White had recourse to Rule 728, Discovery and Inspection, had he desired to avail himself of it. We do not believe that Rule 715 applies here to render the evidence of the collateral offenses inadmissible. And see *Clark & Richardson v. State*, 6 Md. App. 91, 96; *Jones v. State*, 5 Md. App. 180, 188. We hold that it was not reversible error in the circumstances to admit it.[12]

We have held that the trial court was not clearly erroneous in its judgments on the evidence before it. We now hold that the evidence was properly before it. The judgments as to White are affirmed.

### The Convictions of Manuel Polisher

Evidence adduced by the State proved that Brunswick Exchange, Inc. was a District of Columbia corporation, duly qualified to do business in Maryland. Its personal property return as of 1 January 1970 filed with the State Department of Assessments and Taxation stated that its mailing address was 4865 Bethesda Avenue, Bethesda, Maryland, that it was incorporated 3 January 1955 in the District of Columbia, that the nature of its business

---

12. We note that *Willis v. State*, 205 Md. 118, cited by appellants, was decided in light of the provisions of Code, Art. 27, § 608 which was repealed by Acts 1963, ch. 558, § 1 and superseded by Rules 715 and 728. And it was concerned with an attempt to correct an indictment by way of a Bill of Particulars. The indictments here were sufficient to charge the offense. See Code, Art. 27, § 609.

conducted in Maryland was "auto repairs", that it began to do business in Maryland in 1966, that its principal office or place of business was the same as its mailing address, that its officers were Manuel Polisher, president; Harold Strachan, vice-president, and Evelyn Polisher, secretary and treasurer, all with the address 4701 Willard Avenue, Bethesda, Md., and that its directors were the same as its officers.

Mosier knew Polisher from Polisher's association with Vanguard. He recounted, as set out *supra*, Polisher's activities with regard to the Nesbitt car on a day when Polisher was in physical charge of the Bethesda shop. Polisher directed Mosier to get the Nesbitt car torn apart so it could not leave the shop that day, saying, "I want to make sure that this car stays for Larry to take care of the ticket." Mosier testified that Polisher told Barbara Nesbitt's mother, in reply to her inquiry what he was doing in the Bethesda shop (she had dealt with him in the Benning Road shop) he said "that he owns and operates all three Vanguard shops; that he is in charge of all three of them, the running of them." And he recalled what Polisher told him when he started to question Polisher's orders by explaining what White had instructed him to do, "I don't care what Larry says, Larry doesn't know anything about cars, I am the one that knows about cars here. Larry is here to sell customers and sell them whatever he wants to and that is all he is here for."

Wettrich knew Polisher, identifying him in court; "I know him by the name of Manny. I don't know his last name." In August 1969 Polisher was in the shop in White's absence. A woman brought in a car Wettrich had worked on a week or ten days before at which time White had made out the bill. Wettrich had taken the cylinder head off because "it had a couple of bad compressions" and the radiator off because it was leaking. The radiator had been repaired by Montgomery Radiator Repairs and Wettrich personally had ground the valves. He had replaced the cylinder head and when the radiator was repaired replaced it. When the woman brought the

car back Polisher told Wettrich to fix the car. Wettrich said he was on a coffee break and Polisher said, "You better fix this fucking car because we charged this lady $800 for an engine overhaul." Wettrich told Polisher that he did not overhaul the car and all Polisher said was "You better get back there right now." Wettrich went home. The next day when Wettrich returned the car was still there. Someone had installed a fuel pump but the car would not start. White asked Wettrich to check it and Wettrich found that a part in the fuel pump was missing. He replaced it and the car started. In August or September 1969 near quitting time Polisher came up to Wettrich and told him that a man had brought his car in regarding transmission trouble but had decided not to permit Vanguard to work on it. Polisher asked Wettrich if he had any valve grinding compound. Wettrich said he did not and asked why Polisher wanted it. Polisher said he wanted to put it in the transmission of the man's car. (It is patent that valve grinding compound in the transmission would ruin the parts therein). Polisher then ordered Wettrich to put varsol in the transmission, and Wettrich did so. The car was put on the lot and the owner picked it up. Wettrich testified that a transmission filled with varsol would burn up.

Schuettler came from Germany and worked at Vanguard because Polisher had "paid for my visa * * * and signed me the papers so I could work for Vanguard when I came over here to the United States." He did not speak or understand English when he arrived. After he had been at Vanguard about two months he was talking in German to his wife's cousin. He told her, "I think they don't do fair business over there and they charge customers for things never done because I see too many customers come into the shop and complain about work done on the car." His wife's cousin called Polisher about the matter. Polisher told him that Schuettler did not understand English and that it was not true "what I was telling him about his wrong business they do."

As false pretenses is a misdemeanor all those partici-

pating in the offense, whether as principal or perpetrator, accessory before the fact, or aider or abettor are chargeable as principals. *Coleman v. State,* 209 Md. 379, 384, citing *Seward v. State,* 208 Md. 341 and *Roddy v. Finnegan,* 43 Md. 490, 503, 504. "The legal definition of the word 'aider' is not different from its meaning in common parlance. It means one who assists, supports or supplements the efforts of another. The word 'abettor' means in law one who instigates, advises or encourages the commission of a crime. Thus the word 'abet' may import that one is present at the commission of a crime without giving active assistance. * * * To be an aider or abettor it is not essential that there be a prearranged concert of action, although, in the absence of such action, it is essential that one in some way should advocate the commission of the crime. * * *" *Anello v. State,* 201 Md. 164, 169. And while guilty knowledge on the part of the accessory, aider or abettor that the unlawful act is being committed is essential, such knowledge may be inferred from facts and circumstances such as would cause a reasonable man of ordinary intelligence, observation and caution to so believe. So in a misdemeanor a person may be chargeable as a principal if he performs some act or takes some part in the commission of the crime or owes some duty to the person in danger.

We think that the evidence before the court at the least was sufficient in law to support a rational inference that Polisher not only knew what White was doing but assisted, supported or supplemented his efforts and instigated, advised or encouraged the offenses, including those in which Mrs. Miller and Walsh were the victims. It would be straining credulity to believe that Polisher, the president of the company, who by his own words owned and operated all three Vanguard shops and was in charge of running them, who said that White was there to sell customers whatever he wants to, who agreed to pay and paid $601 to have another shop repair the Walsh car after Walsh requested White to get permission from White's boss, who ordered varsol put in a transmission of a car

to burn it up because the owner would not allow Vanguard to repair it, who when warned through his mechanic Schuettler, whom he had brought from Germany, that his customers were being charged for work not done, dismissed the matter off-hand to the informant with the assertion that Schuettler did not understand English, who ordered a car taken apart to keep it in the shop overnight so White could "take care of the ticket", who knew that an $800 charge for an engine overhaul was false because he was told the work had not been done, who, on occasion, was in actual physical charge of the shop, and who as a rational inference from the evidence could only have been White's immediate and only supervisor, did not with common criminal intent with White, in some way, advocate or encourage the commission of the offenses. We find that the lower court could have properly found that Polisher was culpably implicated in, or unlawfully cooperated, aided or abetted in obtaining money by a false pretense from Mrs. Miller and from Walsh. We hold that its judgment on the evidence before it was not clearly erroneous.

We think that the evidence was properly before the court. The evidence as to the other transactions was admissible for the reasons set out above in our discussion of the White convictions. Nor was such evidence precluded by the failure to state it in the bill of particulars. As before indicated Rule 715 b provides, upon demand, for particulars as to the offense charged and not as to all evidence which the State may adduce to prove it. Even if all the Vanguard mechanics who testified were accomplices we think their testimony was corroborated as required by the rule of law relating thereto. It is clear that there was evidence apart from the testimony of the mechanics which identified Polisher with White, the perpetrator of the crimes. This was sufficient corroboration. *Boone v. State, supra.* The court had found in denying a motion for judgment of acquittal at the close of evidence offered by the State, that there was sufficient corroboration. At the close of all the evidence noting that "the

Rule of Corroboration * * * need not be such as independent of the accomplices' testimony to support a finding of guilt beyond a reasonable doubt", it found the evidence sufficient. We do not think this judgment was clearly erroneous.[13] *Sutton v. State, supra; Gaskins v. State,* 10 Md. App. 666.

Polisher also contends that the trial court erred in finding the State's witness Wettrich credible and the defense's witness James Beattie incredible. It is well settled that the credibility of the witnesses and the weight to be given their testimony are matters for the trier of fact. *Felder v. State,* 6 Md. App. 212, 215.

Polisher filed a "Reply Brief" in this Court. In fact it presents an entirely new question—whether the joint representation of both Polisher and White below [14] was a conflict of interest which arose when evidence of collateral transactions were admitted. The point was not tried and decided below and is not properly before us on direct appeal. Rule 1085. See *State v. Zimmerman,* 261 Md. 11. Nor, in the circumstances, do we find that the trial court committed reversible error in not considering the point *sua sponte.* Compare *Brown v. State,* 10 Md. App. 215.

*Judgments affirmed.*
*Appellants to pay costs.*

---

13. The lower court found it difficult to accept that all the mechanics were accomplices and observed that it was defendants' burden to show by a preponderance of the evidence who was an accomplice. We assume, *arguendo,* that all of them were accomplices.
14. Neither counsel on appeal represented appellants below.