377 So.2d 912 (1979)
Grover WOODFORK
v.
STATE of Mississippi.
No. 51568.
Supreme Court of Mississippi.
December 12, 1979.
*913 Fraiser, Burgoon, Henson & Abraham, James W. Burgoon, Jr., Greenwood, for appellant.
A.F. Summer, Atty. Gen. by Catherine Walker Underwood, Sp. Asst. Atty. Gen., Jackson, for appellee.
Before ROBERTSON, LEE and BOWLING, JJ.
ROBERTSON, Presiding Justice, for the Court:
Grover Woodfork was indicted, tried and convicted in the Circuit Court of Leflore County for the crime of obtaining money by false pretenses from Rosie Lee Gibson on March 31, 1978. He was sentenced to serve 2 years with the State Department of Corrections, with credit for time served in the Leflore County jail.
His four assignments of error can be summed up in these three questions:
I. Did the indictment fail to allege ownership of the money and fail to set forth a representation as to an existing fact or past event?
II. Did the trial court err in refusing to grant the appellant's motion for directed verdict?
III. Did the trial court err in refusing a peremptory instruction and motion for new trial, and was the verdict against the overwhelming weight of the evidence?

I.
We are of the opinion that the trial court was correct in overruling the demurrer to the indictment. There was sufficient language *914 in the indictment alleging ownership of the $313 by Rosie Lee Gibson, and that she had the money in her possession and turned it over to Woodfork because of his false representations to her.
This Court said in Westmoreland v. State, 246 So.2d 487 (Miss. 1971):
"The requirements of specificity with respect to allegation of ownership demand neither a deraignment of title nor a statement in `direct terms' showing perfect title where ownership of the money or property obtained reasonably appears from the whole indictment and there is nothing in the indictment to support or suggest any other reasonable conclusion." 246 So.2d at 489-90.

II.
Appellant contends that a directed verdict should have been granted because of a material variance between the indictment and the evidence adduced and because the state failed to prove an intent to defraud.
Although there probably is some merit in these grounds, the appellant has failed to properly preserve these errors for appeal. This Court has consistently held that an appellant on appeal cannot assign as error the overruling of a motion for a directed verdict made at the conclusion of the State's case when the appellant proceeds on the overruling of his motion to introduce evidence in his own behalf. Rich v. State, 322 So.2d 468 (Miss. 1975); Anselmo v. State, 312 So.2d 712 (Miss. 1975).
In the case at bar, the appellant testified in his own behalf after the court overruled his motion for a directed verdict.

III.
The principal evidence against Woodfork was the testimony of Rosie Lee Gibson, a social security recipient, and Carl McLean, Woodfork's supervisor at the social security office in Greenwood.
Woodfork testified in his own behalf at the trial, and Alma Gardner Taylor, a co-worker at the Greenwood social security office, testified for the defense at the hearing on the motion for a new trial.
Rosie Lee Gibson had been drawing social security benefits for about a year when in February, 1978, she received a routine questionnaire from the Social Security Administration. She completed the questionnaire and mailed it back, where it was examined by Grover Woodfork, a claims representative for the social security office in Greenwood.
Woodfork's job with the social security office was to evaluate these questionnaires, called redeterminations, to see if a change in status required an increase or decrease in supplemental security income. He correctly determined that Ms. Gibson should have been receiving more benefits. Woodfork programmed the redetermination into the computer system to issue a check in Baltimore for retroactive benefits for Ms. Gibson from February, 1977. The redetermination was programmed into the computer on March 17, 1978, and the check was issued on March 23, 1978. Subsequently, upon re-reading and studying the social security regulations, Woodfork thought he had erred in the redetermination; that Ms. Gibson could only receive retroactive benefits from July, 1977, and that the check already programmed to be issued would result in an overpayment.
Ms. Gibson testified that she received a postcard advising her to call Woodfork at the social security office. Woodfork told her she was to get an additional check for retroactive benefits but because of an overpayment, she would have to return $313.00 of it, and she was instructed to call him when she received the check for retroactive benefits.
Woodfork testified that rather than put the correction into the computer, which might not have accepted the reprogramming, and, in any event, would have delayed the check already being processed, he began a manual overpayment file on a Friday afternoon to record the correction. He was out of the office the following week and on his first day back, Ms. Gibson called to tell him she had received and cashed the check. Ms. Gibson, after receiving the *915 check, also received a form letter from the social security office in Baltimore explaining the check. She became suspicious and called the social security office and the police about Woodfork's instructions to return $313.00 to the government. Ms. Gibson agreed to cooperate with the police to set a trap for Woodfork by recording the serial numbers on the money, spraying it with a fluorescent dye, and calling Woodfork to inform him that she had received the check. When she called Woodfork, he went to her home about noon on March 31, 1978, received $315.00 in cash from her, and gave her $2.00 in change. Ms. Gibson testified Woodfork told her he could not give her a receipt then because his receipt book was in Washington, while Woodfork testified he had left his receipt book at the office where he intended to return with the money, purchase a money order to be forwarded to Washington, and mail a receipt to Ms. Gibson. After Woodfork received the money and was about to get in his car, Ms. Gibson gave a pre-arranged signal to hidden police who immediately arrested Woodfork.
Carl McLean, the assistant district manager at the Greenwood social security office and Woodfork's supervisor, testified on the normal procedures for recording and collecting overpayments. He stated that the computer printout did not reflect an overpayment to Ms. Gibson, and that the office is required to give written notice to an overpaid individual rather than verbal notice by telephone. McLean had not heard of the terms "manual overpayment file," or "manual collection of overpayment." He admitted that not all overpayments were programmed through the computer system and that the Greenwood office had a backlog of some 300 cases to be programmed into the computer. Of the 6,200 redeterminations handled in the Greenwood office, numerous overpayments had been made and Woodfork was supposed to collect these. Woodfork in the past had made other cash collections of overpayments and turned them into the office, as had other social security personnel.
At the hearing on the motion for a new trial on the grounds of newly-discovered evidence, Ms. Alma Taylor, a service representative at the Greenwood social security office for 21 years, contradicted McLean's testimony about computation of overpayments and notifying and collecting from overpayment recipients. She was quite familiar with manual computation of overpayments and said many overpayments are computed manually. The claims manual used by the social security employees authorizes verbal notice to a claimant of an overpayment and formal written notice may be sent out later. If the claimant has the overpayment, an oral request for a refund may be made immediately. Collection of overpayments in cash was commonly done, and many times a claims representative would not have his receipt book with him when accepting a refund, or would be busy and would just mail the receipt later. A claims representative would collect an overpayment in person where an old person without transportation requested assistance.
Woodfork contends that the court erred (1) in not sustaining his motion for a new trial on the ground of newly-discovered evidence; (2) that his motion for a peremptory instruction should have been sustained; and (3) that the verdict was against the overwhelming weight of the evidence.
Woodfork's main contention is that the State simply did not prove a case against him. The State did not prove that Gibson intended for title as well as possession to pass to him; neither did Ms. Gibson rely on his alleged false representation in delivering the $313.00 to him, nor did the State prove that Woodfork intended to defraud her. These are all essential elements of the crime of obtaining money by false pretense.
In a false pretense case, the owner, in parting with his property, must intend to invest the recipient with title, as well as possession. Jones v. State, 223 Miss. 812, 79 So.2d 273 (1955); Courtney v. State, 174 Miss. 147, 164 So. 227 (1935). The record reflects that Rosie Lee Gibson, if anything, gave Woodfork the money so that he could *916 return possession and title to the government.
Additionally, Gibson's testimony was that she knew, under the plan worked out with the police, that they would return her money to her. She, therefore, did not rely on and was not motivated by Woodfork's alleged false representation in giving the money to him. A material element of obtaining money under false pretenses is that the false pretense must have been relied upon by the party defrauded. Hughes v. State, 326 So.2d 469 (Miss. 1976); Breland v. State, 222 Miss. 792, 77 So.2d 300 (1955). In Breland, a false pretense conviction was reversed because the seller's representation that a parcel of land was lien free had not been relied on by the buyer, who had hired an attorney to conduct a title search. The false representation in Hughes, that a bottle of oil would cure arthritis, was not relied on by the deputy sheriff who voluntarily purchased it as part of his investigation.
Here, as in Breland, the alleged misrepresentation was not relied on by Ms. Gibson, who contacted the social security office on her own to investigate Woodfork's representation. When she handed the money to Woodfork, as in Hughes, she did not do so because of Woodfork's representation but as part of a police plan to trap Woodfork. The State completely failed to prove any reliance by Ms. Gibson on Woodfork's alleged misrepresentation when she handed the money to him.
Finally, the State failed to prove the necessary element that the appellant intended to defraud Ms. Gibson. In order to obtain a conviction for false pretenses, it must be shown that the accused knew the representation was false and made it with the intent to deceive. Hughes v. State, supra; Young v. State, 209 So.2d 189 (Miss. 1968). Here the State's proof of Woodfork's intent was the testimony by Carl McLean, Woodfork's supervisor, that Woodfork did not follow office procedures in collecting the overpayment, and that the regulations did not provide for verbal contact with a claimant and manual computation of an overpayment.
But McLean's testimony contained inconsistencies concerning Woodfork's alleged violation of procedures. He admitted that Woodfork was operating under a heavy workload and numerous errors had been made in the past. A large backlog of cases to be programmed into the computer existed in the Greenwood office. McLean testified that Woodfork had collected numerous overpayments in the past and had turned them in to the office.
Ms. Taylor's testimony on the motion for a new trial also contradicted much of McLean's testimony about "normal" procedures for collecting overpayments. Her testimony showed that even McLean was unfamiliar with the applicable social security regulations, that the regulations provided for informal oral notice of overpayments and the manual computation of overpayments. Her testimony also indicated that, because of the tremendous workload, social security employees frequently did not abide strictly by the requirements of the regulation, and would often postpone completing paper work until they had more time. It was not uncommon for collections to be made in cash with receipts mailed out at some later date. Ms. Taylor's testimony indicated Woodfork's actions were not out of the ordinary for an overworked social security staff, and rebutted any inference of intent created by McLean's testimony.
Finally, Woodfork was arrested as he returned to his car parked in front of Gibson's home. The police acted too hastily in arresting Woodfork without giving him the opportunity to turn in the money to the social security office as he had done in the past.
After the hearing on the motion for a new trial, the court should have ruled that the State had not proved its case against the defendant, and should have set aside the verdict as being against the overwhelming weight of the evidence and should have discharged the defendant.
The conviction and sentence are, therefore, reversed and the appellant discharged.
REVERSED AND APPELLANT DISCHARGED.
*917 PATTERSON, C.J., SMITH, P.J., and WALKER, BROOM, LEE and BOWLING, JJ., concur.
SUGG and COFER, JJ., took no part.