482 A.2d 168

**Patrick Henry FRANKLIN**

v.

**STATE of Maryland.**

**No. 43, Sept. Term, 1984.**

Court of Special Appeals of Maryland.

Oct. 10, 1984.

Certiorari Denied Feb. 5, 1985.

Sherrie R. Berger, Assigned Public Defender, with whom was Alan H. Murrell, Public Defender, on the brief, for appellant.

Richard B. Rosenblatt, Asst. Atty. Gen., with whom were Stephen H. Sachs, Atty. Gen., Kurt L. Schmoke, State's Atty., for Baltimore City and Gary Honick, Asst. State's Atty., for Baltimore City on the brief, for appellee.

Submitted before WILNER, BISHOP and BLOOM, JJ.

WILNER, Judge.

In May or June of 1981, Earl Black, an investigator for the U.S. Immigration and Naturalization Service (INS), began an undercover investigation into the unlawful issuing of alien work permits. Although the investigation was directed at discovering whether any INS employees were involved in such activities, Black's attention soon began to focus on appellant, who was not an INS employee but the pastor (and senior bishop and chairman of the board of trustees) of St. Martin Spiritual Church of Christ.

Following an initial telephone conversation two days earlier, Black, posing as an illegal alien named Earl Cumberbatch, met with appellant at the church on July 2, 1981. He told appellant that he was an illegal alien and that he desired to purchase alien registration cards and other immigration documents. In particular, he gave appellant an Immigration Form I–94 to be stamped "Employment Authorized" by INS. That stamp on that form authorizes the alien to obtain employment; it serves as a type of work permit, and we shall hereafter refer to it as a work permit. The document given to appellant looked old and dirty. Appellant copied the information on it and returned it, telling Black that he (appellant) would obtain a new form.

Black met with appellant again at the church on July 9. Appellant explained that he had some people to pay in order to get the work permit, and that Black would have the permit seven days after the money was paid. Black thereupon gave appellant $175, for which he got a receipt. The receipt showed the money as a donation to the church, appellant explaining, "I have to say that for my income tax." Appellant reiterated that Black would have the work permit in seven days, stating at one point, "I guarantee my word if I don't get it I don't get your money. But you don't get it for seven days." Black was instructed to call again in seven days.

Black called on July 19; appellant said that "he had good news for me but he was going out of town until the following day." Black called again on July 22 and was told that appellant "had a 2:00 P.M. appointment at the Immigration Office to get my papers." Black went to the church later that day but was told by appellant that "yours had to go through one more thing"; he was instructed to call several days hence.

Black made several attempts thereafter to contact appellant, without success. He finally was able to meet with him on September 24, 1981. Appellant said that the person he was dealing with at INS had gone away, and that he needed

another $50. At one point, appellant agreed either to obtain the work permit or refund the $175 already paid. Later, at the end of the conversation, it was left that Black would pay the extra $50 and that appellant would notify him when to bring it. Nothing more occurred until December 21, 1981, when Black called appellant and was told to call back in several days. He made no further effort to contact appellant, and so he received neither the work permit nor the return of his $175.

Pursuant to proper authority, not challenged in this appeal, Black had his conversations with appellant on July 7, July 9, July 22, September 24, and December 21 surreptitiously recorded.

Upon these facts, appellant was charged with, and convicted by a jury in the Circuit Court for Baltimore City of, theft under $300. The conviction was based on Md.Code Ann. art. 27, § 342(b), which provides:

"A person commits the offense of theft when he willfully or knowingly uses deception to obtain and does obtain control over property of the owner, and;

(1) Has the purpose of depriving the owner of the property; or

(2) Willfully or knowingly uses, conceals, or abandons the property in such manner as to deprive the owner of the property; or

(3) Uses, conceals, or abandons the property knowing such use, concealment, or abandonment probably will deprive the owner of the property."

In this appeal, appellant complains, one, that the evidence was insufficient to support his conviction, and, two, that the court erred in admitting into evidence typed transcripts of the several conversations between Black and appellant that were electronically recorded. We find no error, and shall therefore affirm.

### (1) Sufficiency Of The Evidence

The Maryland theft law under which appellant was convicted (Md.Code Ann. art. 27, §§ 340–344) consolidated into

the single crime of theft a number of separate crimes that formerly existed, one of which was false pretenses. *See* art. 27, § 341. Conduct formerly amounting to false pretenses was made punishable as theft by deception under § 342(b). The word "deception," as used in § 342(b), *supra*, is defined in § 340(b) as including, among other things, knowingly to "[p]romise performance which the offender does not intend to perform or knows will not be performed." Section 340(b) goes on to provide that "[t]he defendant's intention or knowledge that a promise would not be performed shall not be established by or inferred from the fact alone that the promise was not performed" and that deception does not include "puffing or false statements of immaterial facts and exaggerated representations unlikely to deceive ordinary persons."

At appellant's request, and without objection from the State, the court, in its instructions to the jury, defined the crime of theft by deception in terms of the elements of the former crime of false pretenses, as though the two offenses were synonymous. Indeed, the court at one point characterized the crime as "theft by false pretense," and defined it as follows:

"Now, this crime is committed when money or some other property is obtained from another by making a false representation of a past or existing fact with the intent to defraud, and with knowledge of such falsity. In order for the defendant to be guilty of this offense the State must prove that the defendant made a false representation of a past or existing fact, the representation was made with the knowledge of its falsity, this representation was made with the intent to defraud, the person to whom these false representations were made relied upon them to his detriment and, as a result of that reliance, the defendant obtained money or other property from that person."

That statement, essentially, is the definition of the former crime of false pretenses, as set forth in repealed § 140 of

art. 27 and explicated in *Polisher v. State,* 11 Md.App. 555, 560, 276 A.2d 102 (1971).

█ As no one objected to this instruction below and as no one complains of it in this appeal, we have no occasion to consider its propriety. We do note, however, that § 342(b) of art. 27 is not cast in the same language as former § 140 and does not purport merely to codify the concept of "false pretense" set forth in *Polisher.* Rather, although the crime of theft generally encompasses what formerly was false pretenses, §§ 340(b) and 342(b) seem to have been based on analogous statutes in other States, and not on any preexisting Maryland law. *See Revision Of Maryland Theft Laws And Bad Check Laws,* Md.Gen. Assembly (1978), pp. 8–10 and 34, and *compare State v. Finch,* 223 Kan. 398, 573 P.2d 1048 (1978). Section 340(b)(vii), in particular, defining "deception" in terms of promises not intended to be kept, was apparently taken from an Oregon statute. *Revision, supra,* p. 10. Using the elements of the former crime to define theft by deception may not, therefore, be entirely appropriate, and we caution the trial courts to be wary of uncritically doing so.

Proceeding upon the premise that theft by deception is indeed the same crime as false pretenses, appellant argues that the evidence failed to establish three of the requisite elements—that appellant made a false representation, that he intended to defraud Black, and that Black actually relied on appellant's representations in parting with the $175. We shall assume, for purposes of this case, that those three elements are, in fact, required to prove theft by deception under § 340(b)(vii) and § 342(b)—that making a promise that the promisor does not intend to perform or knows will not be performed in order to obtain money or other property is the equivalent of making a false representation with intent to defraud, and that, at least implicitly, there is no deception unless the victim relies on the empty promise to his detriment. *Cf. State v. Jones,* 657 P.2d 1263 (Utah 1982).

With that assumption, the evidence nevertheless clearly sufficed to establish all three elements, and with them the requisite elements of theft by deception. Appellant extracted $175 from Black upon the express promise (representation) that he could and would obtain an INS stamp on the I–94 Form within seven days. The seven days dragged out to five months; Black contacted appellant on four separate occasions, was put off each time, and never received either the stamped form or the return of his money. Although one might reasonably infer that appellant initially accepted the money in good faith in the belief that he could in fact obtain the stamped form and that he simply became unable to carry out his end of the bargain, it is equally inferrable that he knew in July, when he extracted the money, that he either could not or would not obtain the promised stamp. The statements made by appellant and the excuses given by him between July and December were inconsistent enough to warrant a finding that his intent was fraudulent from the beginning.[1]

Appellant's principal thrust seems to be directed at the question of reliance. He argues that, as an INS agent, Black knew full well that appellant could not obtain a valid INS work permit, and that he therefore could not possibly have relied on appellant's representation or promise to produce such a permit. In support of that argument, he cites *Dolan v. State,* 1 Md.App. 292, 229 A.2d 443 (1967), *Woodfork v. State,* 377 So.2d 912 (Miss.1979), and *Reg. v. Mills* (1857), Dears 8 B.C.C. 205, 7 Cox C.C. 263.

There are, indeed, a line of cases, including *Dolan* and *Woodfork,* that arise out of "sting" operations and hold that, if the investigator/"victim" in fact knows that the target cannot produce what is bargained for, there is no

---

**1.** Initially, he indicated that at least part of the $175 was for himself, noting that it had to be cast as a donation to the church for his income tax purposes, yet later he told Black that he paid it to other people. His excuses for the delay varied—his "contact" was out of town, he was out of town, "one more thing" had to be done, the "contact" wanted more money.

false pretense or theft by deception. *See,* in addition to *Dolan* and *Woodfork, Sherrill v. Nicholson,* 545 F.Supp. 573 (W.D.Ky.1982); *State v. Greenberg,* 382 A.2d 58 (N.J. 1977); *Harwei, Inc. v. State,* 459 N.E.2d 52 (Ind.App.1984); *People v. Terranova,* 563 P.2d 363 (Colo.App.1977); *State v. Franco,* 153 N.J.Super. 428, 379 A.2d 1292 (1977). We have no difficulty or disagreement with the rule established in those cases. Indeed, that is what we held in *Dolan.* The problem, for appellant, is that those cases are inapposite here.

In *Dolan,* an investigator for the Department of Motor Vehicles, knowing that Mr. Dolan's license to sell insurance had been suspended, went to Dolan's place of business and attempted to purchase automobile insurance. He paid Dolan $20 and received in return a form certifying that he was insured and eligible to obtain license tags. We reversed Dolan's conviction for false pretenses on the basis of the concession "that the supposed victim of the false pretense knew that any representation by Dolan that he possessed the power and authority to commit an insurer to the protection of a proposed assured was false." 1 Md.App. at 295, 229 A.2d 443.

*Sherrill v. Nicholson, supra,* 545 F.Supp. 573, involved a federal *habeas corpus* proceeding to nullify a State court conviction of false pretenses. The conviction stemmed from the sale of dogs by Sherrill that were represented by him to be registered by the American Kennel Club (AKC) and for which he gave fraudulent AKC registration papers. The dogs in question were sold to undercover investigators who knew that the dogs were not registered and that the registration papers were not genuine. On that basis, the writ issued. *Greenberg, supra,* involved a lawyer who extracted money from a client to influence a public official to vacate a prison term imposed on the client. The client had previously alerted the police, who provided the money, arranged to have the incriminating conversation recorded, and immediately retrieved the money once the client left the attorney's office. Reversing the attorney's ensuing conviction for

false pretenses, the New Jersey Court found the fact that the client was acting in collaboration with the police "compels the conclusion that he could not have believed that the money would be used for the pretended purpose." 382 A.2d at 59.

*Harwei, Inc., supra,* arose out of an investigation into automobile transmission repair shops. Harwei was convicted of theft by deception for obtaining money from two customers by falsely representing that their transmission needed replacement. In fact, the customers were investigators who knew, by reason of a previous mechanical inspection, that there was nothing wrong with the transmission. As they knew the true condition of their transmission and thus that the defendant's representations were false, "no false impression was or could have been created...." 459 N.E.2d at 57.

Those cases, and others like them, turned on the fact that the "victim" knew either that the condition represented by the defendant was not true or that the defendant could not produce the thing or the service bargained for. But that is not the situation here. Black was not relying on appellant to produce a genuine, valid work permit. He knew that appellant could not obtain such a document. What he bargained and paid for, both as Earl Black, undercover agent, and as Earl Cumberbatch, illegal alien, was a counterfeit document that would pass as valid. *That*—not the genuine article—is what appellant promised to produce; *that* is what Black thought he *would* produce; *that* is what Black paid $175 to obtain.

This is not merely a technical distinction, nor is it one applicable only to "sting" operations. It goes to the nature of the bargain—what was promised, and what was expected by the "victim." There is, unfortunately, a market for counterfeit documents of virtually every kind, from birth certificates to death certificates and nearly everything in-between. Bogus documents have substantial economic value to people desiring them, and we see no reason why a

fraudulent promise to produce such an item should be treated differently than a fraudulent promise to produce a genuine document. The would-be buyer may well intend to use the item for an illegal purpose, and, in that sense, may be deserving of no sympathy from the courts. But whatever the public policy may be as to any private right of action by the buyer against the defrauder—a matter not now before us—the State has an independent interest in punishing those who steal, and that interest should not be ignored merely because the theft arises from a legally suspect transaction. *Cf. Commonwealth v. Mitchell*, 234 Pa.Super. 21, 335 A.2d 521 (1975); *Brown v. Com.*, 656 S.W.2d 727 (Ky.1983).

■ Upon this record, we think the evidence sufficed to establish the requisite elements of theft by deception, whether couched in terms of false pretenses or the current statutory criteria.

## (2) *Admission Of The Tapes*

As noted, five of the conversations between Black and appellant were recorded. At trial, the tapes of those conversations were admitted into evidence and played for the jury. A typed transcript of each tape was also admitted into evidence after being authenticated by Mr. Black as accurately recording what was on the tape. Appellant now complains that the transcripts "were not a true and accurate reflection of the tape recorded conversations," and that their admission into evidence was therefore error.

■ We note first that, except for a pretrial motion *in limine*, which does not suffice to preserve an objection for appellate review, objection was made to only one of the five transcripts—that of the July 9 conversation. The issue as to the other four is therefore not before us. As to the July 9 transcript, appellant, though generally condemning it as inaccurate, has not seen fit to point out any specific inconsistency between it and the tape. He says it is inaccurate

but does not tell us how or where it is inaccurate. The point is frivolous.

JUDGMENT AFFIRMED; APPELLANT TO PAY THE COSTS.