583 A.2d 1065

**Jacob FRAIDIN**

v.

**STATE of Maryland.**

**No. 1942, Sept. Term, 1989.**

Court of Special Appeals of Maryland.

Jan. 11, 1991.

234

Wilbur D. Preston, Jr. (H. Russell Smouse, Jack L.B. Gohn, Whiteford, Taylor & Preston, Howard L. Cardin and Cardin & Gitomer, on the brief), Baltimore, for appellant.

Gwynn X. Kinsey, Jr., Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and William R. Hymes, State's Atty. for Howard County, Ellicott City, on the brief), for appellee.

Argued before MOYLAN, BISHOP and ALPERT, JJ.

MOYLAN, Judge.

The appellant, Jacob Fraidin (Fraidin), was convicted by a Howard County jury, presided over by Judge Cornelius F. Sybert, Jr., of theft. Upon this appeal, he raises, in effect, the following eight contentions:

1. That the evidence was not legally sufficient for Judge Sybert to submit the case to the jury;

2. That Judge Sybert erroneously admitted a court order from a collateral civil case removing Fraidin as a trustee;

3. That Judge Sybert erroneously admitted prejudicial evidence of events preceding the foreclosure proceeding that was the gravamen of the theft offense;

4. That Judge Sybert erroneously denied him the opportunity to assert "claim-of-right" and "honest belief" defenses;

5. That Fraidin was denied his constitutional right to a speedy trial;

6. That Judge Raymond J. Kane, Jr. improperly failed to recuse himself from pretrial motions hearings;

7. That Judge Sybert erroneously denied his request for a bill of particulars; and

8. That Judge Sybert erroneously refused to give a jury instruction with respect to a prior inconsistent statement by a State's witness.

### The Factual Background

To assess the legal sufficiency of the evidence to convict, and to consider several other contentions as well, it is necessary to set out in significant detail the tangled series of financial arrangements preceding and accompanying the alleged theft by deception that took place between September 7 and December 4, 1987. Although many of the factual issues were in strenuous dispute, the jury, after a five-day trial, was obviously persuaded by the State's version of events. Our appellate perspective, of course, is to look at that version of the evidence, and any inferences that can fairly be drawn therefrom, most favorable to the State's position.

Fraidin was a principal of Pacific Mortgage and Investment Group, Ltd. (Pacific), which held an $85,000 second mortgage on the property known as 10601 Faulkner Circle, Columbia, first owned for purposes here pertinent by Mr. and Mrs. Solomon Easterling (Easterlings). Although the Pacific mortgage obtained by the Easterlings purported to refinance a first mortgage held by Beneficial Mortgage Co. of Maryland (Beneficial),[1] the money was actually placed in

---

1. The Beneficial mortgage itself had actually refinanced an earlier mortgage the Easterlings had obtained from another financial institu-

an escrow account[2]. No funds were ever disbursed to Beneficial to satisfy the Beneficial mortgage.

The Easterlings almost immediately elected to rescind the Pacific mortgage.[3] While it is not clear from the record whether their election was timely, we shall proceed as if the

tion. As that mortgage was paid in full, however, it is not pertinent to these proceedings.

2. At the March 28, 1985, Pacific mortgage settlement, conducted by Fraidin, the Easterlings signed documents which contested the validity of the Beneficial mortgage. In pertinent part, one statement read: "WE DO NOT OWE BENEFICIAL MORTGAGE SIXTY NINE THOUSAND EIGHT HUNDRED————00/100 DOLLARS ($69,000.00) AND REQUEST GIBRALTAR LAND & TITLE COMPANY NOT TO DISBURSE SAME UNTIL THE PAY OFF BALANCE IS LITIGATED. WE FULLY UNDERSTAND THAT GIBRALTAR LAND & TITLE COMPANY WILL NOT BE PAYING US ANY INTEREST ON THE ESCROW FUNDS OF $69,785.00 AND IF INTEREST IS EARNED IT SHALL BE ADDITIONAL COMPENSATION TO GIBRALTAR LAND & TITLE FOR HANDELING [sic] THIS TRANSACTION." Fraidin was co-owner, with Alan Meyers, an attorney, of Gibraltar Land & Title Company (Gibraltar). According to the Easterlings, Fraidin had suggested that the Beneficial mortgage was defective and that Alan Meyers could negotiate a reduced payoff figure for it. Barbara Frank, a defense witness, testified that she had referred the Easterlings to Fraidin, and that the Easterlings disputed the *amount* that was owed to Beneficial prior to their interview with Fraidin. In its briefs, however, the defense contends that the dispute centered around the Beneficial interest rate, which may have been considered usurious "in Mr. Easterling's and Mr. Fraidin's laymen's view." The interest on the Beneficial loan was 20 percent. The interest on the Pacific loan was recorded at 19 percent, but the Federal and State Truth–in–Disclosure Statement revealed a rate of 20.73 percent.

The Easterlings signed another document at the Pacific mortgage settlement requesting Meyers' representation to litigate the Beneficial mortgage. All documents were prepared by Fraidin.

3. A mortgagor is permitted by state and federal law to rescind a residential refinance transaction, made at a *higher* rate of interest, within three business days. 15 U.S.C. § 1635(a); Md.Com.Law Code Ann. § 12–116(5) (1975, 1990 Repl.Vol.); *Dorsey v. Beads*, 288 Md. 161, 171–72, 416 A.2d 739 (1980) (applying federal law). The Easterlings had until the end of the working day of April 2, 1985 to rescind the Pacific loan. Mr. Easterling testified that he hand-delivered the rescission notice to Sherry Rosenstein, Fraidin's secretary, on Monday, April 1. Ms. Rosenstein testified that the rescission was delivered on April 16, and the defense introduced her letter of that date notifying the Easterlings that their election to rescind was untimely.

mortgage were not rescinded. The Easterlings behaved, however, as if they believed the Pacific mortgage had been rescinded and the Beneficial mortgage were still in effect. It is undisputed that the Easterlings never received the $2,496 in excess loan proceeds that would have been due them under a valid mortgage loan from Pacific, although the documents recorded in the land records show that they received the money. The Easterlings continued to make payments to Beneficial, but made no payments to Pacific. Approximately two years later, Fraidin nevertheless commenced foreclosure proceedings under the Pacific mortgage.

The foreclosure auction advertisement stated that the property was being sold " 'AS IS' ... subject ... to restrictions of record ... if any," and was read aloud by the auctioneer at the September 7, 1987 auction. Fraidin, however, told potential buyers that "Clear title is gonna pass today". Jonathan Scott (Scott), a home rehabilitation contractor, placed a successful bid of $112,500 and tendered his $10,000 certified check.

Land Title Research of Maryland, Inc. (Land Title), principally owned by Joseph Goldberg (Goldberg), issued Scott a title insurance binder, indicating that the Beneficial mortgage was unreleased of record. Patricia Horak (Horak), office manager of Land Title, called Fraidin to confirm her assumption, based on her title search, the refinance language of the Pacific mortgage, and the tax stamps, that the Beneficial mortgage had been paid off, and the failure to record a release was a mere clerical oversight.[4] Fraidin neither confirmed nor denied her conclusions. Nor did Fraidin correct her statement that she assumed that he, as the closing agent on the last financing, had the Beneficial release. He "agreed" to send Horak the Beneficial release.

The Howard County Circuit Court ratified the sale on November 20, 1987. At the December 4, 1987 settlement,

---

4. The escrow documents were not recorded in the land records.

Fraidin signed a document stating that all the foreclosure proceeds were payable to him, without mention of any deduction for the Beneficial mortgage. Fraidin gave Scott a "trustee's deed," a type of deed lacking the customary title guarantees. On December 7, 1987, Land Title gave Fraidin, as trustee, a check in the amount of $104,064.96, which was deposited in an escrow account.

The Easterlings had stopped making mortgage payments to Beneficial in August 1987. In February 1988, as a consequence, Beneficial advised Scott and Goldberg of its intention to foreclose. Goldberg immediately telephoned Fraidin, protesting that the language of the Pacific mortgage and Fraidin's subsequent conduct had led both him and Land Title to believe that the Beneficial mortgage had, indeed, been satisfied. Fraidin hung up, telling Goldberg, "Get yourself an attorney." Goldberg contacted the State's Attorney.

On February 24, 1988, Fraidin was charged with the theft of over $300, a felony violation under Md.Code Ann. art. 27, § 342 (1957, 1987 Repl.Vol.). Beneficial filed a petition in civil court on March 4 seeking satisfaction of its mortgage and Fraidin's removal as trustee. Meanwhile, Scott made repairs on the house and sold it in April.

The civil hearing concerning the removal of Fraidin as trustee was set before Judge Raymond J. Kane, Jr. on June 6, 1988. Judge Kane recused himself, stating that there might be a conflict of interest in hearing a case wherein Goldberg, his first cousin, was a material witness. Judge Robert F. Fischer took over and adjourned the hearing until June 16 when it became apparent that the it could not be completed that day.

The criminal case, meanwhile, was set in the Howard County District Court for June 15. The State argued that the pending civil matter "may or may not have some bearing" on the criminal case and requested a postponement. Fraidin, representing himself, objected to a postponement, noting that he was not seeking "to delay the

orderly flow of justice by requesting a jury trial or requesting any postponements." Judge James N. Vaughn granted the State's motion for a postponement with the caveat that no further postponements would be granted.

The criminal case was reset in the District Court for September 28, this time before Judge R. Russell Sadler. Judge Sadler ascertained that the appellant expressly waived his right to counsel under Maryland Rule 4–215, and wished to proceed *pro se*. He then informed Fraidin of his right to a jury trial and asked him to elect. Fraidin requested that he be allowed to make a preliminary motion first. The judge advised: "If you want to pray a jury trial, you will take your preliminary motion down to the Circuit Court. If you want a trial in this court, then I will hear your motion and we will proceed to trial." Fraidin elected a jury trial, but protested that the trial judge should have heard his motion in the interests of justice and conservation of court costs, and because it "violate[s] my Constitutional right under the 6th amendment."

In the parallel civil proceeding, Judge Fischer, finding that Fraidin had breached his duty of good faith or loyalty as a fiduciary, ordered him removed as trustee on November 23, 1988.

Judge Kane was scheduled to preside over the preliminary motions hearing in the criminal case on March 2, 1989. He again advised the parties that there might be a conflict of interest regarding Goldberg, his cousin, whose name was listed on the statement of charges. The State argued that although Goldberg might be a witness in the ultimate trial on the merits, no information concerning Goldberg would be adduced at the motions hearing. Fraidin, represented by counsel, indicated that he had no objection to Judge Kane's presiding.

Satisfied that the statement of charges set forth a crime, Judge Kane denied Fraidin's motion to dismiss the statement of charges. He also denied Fraidin's motion to dismiss for lack of speedy trial. On March 23, Fraidin filed a

demand for particulars, which was denied on May 18 after a hearing.

The Circuit Court criminal trial, presided over by Judge Sybert, began on May 24, 1989. Fraidin moved *in limine* to exclude evidence concerning Judge Fischer's order removing him as trustee, as well as any information concerning the merits of the Beneficial or Pacific mortgages. Both motions were denied. The court noted that the State had agreed that it would not introduce the removal order unless the defense first raised the trusteeship issue as a defense. Fraidin declined to take the stand in his own defense. The jury returned a verdict of guilty.

### Legal Sufficiency: The Standard of Review

■ The appellant's brief and especially his reply brief are almost strident in their outrage at the State's brief for putting a decidedly pro-prosecutorial "spin" or "twist" on evidence which was hotly disputed and subject to arguably diametric interpretations. On the issue of legal sufficiency, however, both the State *and the appellant* are enjoined to apply just such a "spin." The slant is required as a matter of law. Of all possible versions of events that would be permitted a fact finder, it is, of course, the most partial one permitted by logic and law which we adopt when assessing the legal sufficiency of the State's case. Fact finding impartiality has nothing to do with measuring a *prima facie* case.

This is because the concern is only with whether the State has met its burden of production and not with whether it has met any burden of persuasion. On the issue of persuasion, the "court of last resort," the petit jury itself, has already *and finally* determined that in the State's favor. The limited question before us, therefore, is not whether the evidence *should have* or *probably would have* persuaded the majority of fact finders but only whether it *possibly could have* persuaded *any* rational fact finder. With no special reference to the present case, we simply restate the axiomatic truth that the random and far-ranging

unpredictability of the fact-finding sweepstakes is such that it accommodates the occasional "long shot" as readily as it embraces the more numerous "favorites." Assuming then maximum permitted partiality on the part of the fact finder, how far will that carry its beneficiary as a matter of law? That is precisely the question addressed by the issue of legal sufficiency.

The conviction must be affirmed if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (emphasis in original). *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979), *rehearing denied,* 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979). *See also Wilson v. State,* 319 Md. 530, 535, 573 A.2d 831 (1990); *Bloodsworth v. State,* 307 Md. 164, 167, 512 A.2d 1056 (1986); *Cardin v. State,* 73 Md.App. 200, 533 A.2d 928 (1987), *cert. denied,* 312 Md. 126, 538 A.2d 777 (1988), *cert. denied,* 488 U.S. 827, 109 S.Ct. 78, 102 L.Ed.2d 55 (1988); *Lane v. State,* 60 Md.App. 412, 419, 483 A.2d 369 (1984), *cert. denied,* 302 Md. 570, 489 A.2d 1129 (1985). The test is "whether the evidence shows directly or supports a rational inference of the facts to be proved, from which the trier of fact could fairly be convinced, beyond a reasonable doubt, of the defendant's guilt of the crime charged." *Wilson v. State,* 319 Md. at 535–36, 573 A.2d 831.

Utilizing that slant, with its unabashed and deliberately built-in partiality, we turn to the issue of the legal sufficiency of the State's case.

### Legal Sufficiency of the Evidence

From the opening gun, the appellant has bombarded us with an impressive pounding of seemingly heavy legal arguments. Once one begins, however, the cooler exercise of parsing the artillery barrage into its component parts, much of the initial fury reduces itself to diffuse and not clearly differentiated sound. Legal arguments have been advanced that might have been formidable before the trial court,

judge or jury. Before the very different appellate bastion, however, they are not adequately focused on the precise target of judicial error.

Even weighty pronouncements of law need to be reduced to specific and narrow questions such as 1) what issues of fact were submitted, over proper objection, to the jury which should not have been? 2) what precise objections to State's evidence were made and improperly overruled? 3) what precise defenses were raised or proffered but improperly prohibited? or 4) what precise jury instructions were specifically requested but improperly denied? Tell us not that the judgment was wrong; point to the page and line where an erroneous ruling occurred.

The appellant's first and major legal argument is entitled, "Mr. Fraidin Was Guilty of No Crime." It is divided into five sub-arguments. We agree with the State's suggested rearrangement of the issues in this case that four of the five sub-issues under that first heading, along with two other sub-issues under a subsequent heading, all deal with whether the State's evidence was legally sufficient to permit Judge Sybert to submit the issue of theft to the jury.

The new (effective July 1, 1979) Consolidated Theft Statute, Md.Ann.Code art. 27, §§ 340–344 (1987 Repl.Vol.), has brought together under a single statutory umbrella a number of preexisting theft-related offenses. Section 341 provides, in pertinent part:

> "Conduct designated as theft in this subheading constitutes a single crime embracing, among others, the separate crimes heretofore known as larceny, larceny by trick, larceny after trust, embezzlement, *false pretenses*, shoplifting, and receiving stolen property." (emphasis supplied).

The preexisting crime reflected by the variety of theft before us in this case is false pretenses. The former crime of false pretenses was spelled out in Art. 27, § 140:

> "Any person who shall by any false pretenses obtain from any other person any chattel, money or valuable security, with intent to defraud any person of the same,

shall be guilty of a misdemeanor...." (footnote omitted).

In *Polisher v. State,* 11 Md.App. 555, 560, 276 A.2d 102 (1971), *cert. denied,* 262 Md. 749 (1971), *cert. denied,* 404 U.S. 984, 92 S.Ct. 449, 30 L.Ed.2d 368 (1971), Judge Orth thoroughly analyzed the legal elements, most of which are still viable under the new consolidated statute, that constituted the crime of false pretenses:

"The false pretense is the crux of the crime. So the crime is committed when a person:

1) by making a false representation of a past or existing fact;

2) with intent to defraud; and

3) knowledge of its falsity;

4) obtains any chattel, money or valuable security from another;

5) who relies on the false representation;[5]

6) to his detriment."[6]

*See also Smith v. State,* 237 Md. 573, 207 A.2d 493 (1965).

The parallel provision of the supervening statute is § 342(b)(1), which provides, in pertinent part:

"A person commits the offense of theft when he willfully or knowingly uses deception to obtain and does obtain control over property of the owner, and;

(1) Has the purpose of depriving the owner of the property."

■ In a jury trial, the only way to raise and to preserve for appellate review the issue of the legal sufficiency of the evidence is to move for a judgment of acquittal on that ground. Under Md.Rule 4–324(a), a defendant is further required to argue precisely the ways in which the evidence should be found wanting and the particular elements of the

---

**5.** Much, if not all, of the vitality of this (and the following) element has been removed from the new statutory crime. *Cardin v. State,* 73 Md.App. at 222–224, 533 A.2d 928.

**6.** See note 5 above.

crime as to which the evidence is deficient. In *State v. Lyles*, 308 Md. 129, 135, 517 A.2d 761 (1986), the Court of Appeals held clearly that a defendant is "required to state with particularity all reasons why his motion for judgment of acquittal should be granted." "Moving for judgment of acquittal on the grounds of insufficiency of the evidence, without argument, does not preserve the issue for appellate review." *Parker v. State*, 72 Md.App. 610, 615, 531 A.2d 1313 (1987). *See also Jordan v. State*, 82 Md.App. 225, 244, 571 A.2d 238 (1990), *cert. granted*, 320 Md. 312, 577 A.2d 362 (1990).

■ Because Fraidin put on a defense, the only motion for judgment of acquittal that remains before us is the motion made at the end of the entire case. Except for the limited purpose of reference back to it, *Warfield v. State*, 315 Md. 474, 487, 554 A.2d 1238 (1989), the earlier such motion, made at the close of the State's case, was withdrawn by operation of law. Md.Rule 4–324(c). In the course of arguing the motion at the end of the entire case, Fraidin affirmatively argued only the adequacy of the State's evidence to prove an act of deception on his part. He did in addition, however, "renew all the arguments that have previously been made." Those arguments that had "previously been made" at the end of the State's case included, in addition to the deception issue, 1) that the State's proof in court was at variance with the charging document [7] and 2) that Fraidin was acting only as a trustee and thus did not obtain the money in his personal capacity.

Our concerns, therefore, in assessing legal sufficiency, are with only two sub-issues: 1) proof of deception and 2) proof of obtaining control.

### Legal Sufficiency: Proof of Deception

■ In § 340, "Definitions," the theft statute defines "Deception" as including, *inter alia*, four types of decep-

---

7. This issue has not been pursued on appeal and is, therefore, not before us.

tive action of which Fraidin could have been found guilty in this case, any one of which would suffice for legal sufficiency purposes:

"(b)(1) *'Deception'* means knowingly to:

(i) Create or confirm in another an impression which is false and which the offender does not believe to be true; or

(ii) Fail to correct a false impression which the offender previously has created or confirmed; or

(iii) Prevent another from acquiring information pertinent to the disposition of the property involved; or

(iv) Sell or otherwise transfer or encumber property, failing to disclose a lien, adverse claim, or other legal impediment to the enjoyment of the property, whether the impediment is or is not of value or is or is not a matter of official record...."

It was Fraidin who moved for the foreclosure sale. The advertisement for the sale, both as contained in the legal notice itself and as read aloud by the auctioneer, did, to be sure, contain the general language, " 'AS IS' ... subject ... to restrictions of record ... if any" (emphasis supplied). The use of stock language and the inclusion of the modifying phrase "if any," however, does raise in the mind of the reader or hearer at least the suggestion that perhaps there were no "restrictions of record."

In any event, it is clear that neither in the pre-auction advertising nor at the auction itself did Fraidin disclose the existence of the Beneficial mortgage. Deferring for the moment any issue of an affirmative defense on Fraidin's part, it was clearly an act of "deception" for him, by the very terms of the statute, to "sell or otherwise transfer or encumber property, failing to disclose a lien,[8] adverse claim,

---

8. A lien is "a charge or security or encumbrance upon property." Black's Law Dictionary 832 (5th ed. 1979). A mortgage is an encumbrance. *Id.* at 473. Where a mortgage is defective in some manner, as the Beneficial mortgage is alleged to be in this case, a court will generally find that there is an equitable mortgage. *Equitable Trust*

or other legal impediment to the enjoyment of the property, whether the impediment is or is not of value or is or is not a matter of official record." Indisputably, he failed to disclose the existence of the Beneficial mortgage.

 Any argument that the possibility that the Beneficial mortgage could have been paid off from existing funds somehow excuses Fraidin from the failure to disclose the mortgage cannot prevail in the face of the statutory language. The Beneficial mortgage was clearly a "legal impediment to the enjoyment of the property" and the statute required its disclosure regardless of "whether the impediment [was] or [was] not of value." This failure to disclose the mortgage was itself an adequate predicate for the jury fairly to infer an act of deception on Fraidin's part.

The deception, however, did not stop at that point with the mere failure to disclose. There were acts of deceptive commission as well as acts of deceptive omission. For reasons to be more fully discussed hereinafter, the auction of September 7, 1987 will not be viewed by us as an isolated and self-contained act to be assessed in a vacuum. It was nonetheless the cresting of a larger pattern of deceptive behavior. The representation made by Fraidin to all of the prospective bidders at the auction, including the ultimately successful bidder Scott, that "clear title is gonna pass today," would qualify under § 340(b)(1)(i) as another form of criminal deception:

"Create or confirm in another an impression which is false and which the offender does not believe to be true."

Fraidin created the impression that the title was unencumbered. That impression was false. Fraidin knew that it was false.

---

*Co. v. Imbesi,* 287 Md. 249, 254, 412 A.2d 96 (1980). Equitable mortgages are equitable liens. *Lubin v. Klein,* 232 Md. 369, 372–373, 193 A.2d 46 (1963).

■ Fraidin nonetheless maintains that his statement "Clear title is gonna pass today" could not be the basis of any violation of the theft statute. He reasons:

"As a matter of law, clear title is marketable title. Black's Law Dictionary at 228 (5th ed. 1979). It is undisputable from the record that Mr. Scott was in fact able to remarket his title to buyers who had a title company protecting them, while the Beneficial lien remained of record, and also while it apparently remained unpaid. By definition, therefore, the title that Mr. Fraidin sold Mr. Scott was marketable, and thus clear title. Mr. Fraidin was stating no more than the truth."

Fraidin is asserting the *ipse dixit* that because a seller is somehow able, by one means or another, actually to market the title, the title is thereby "marketable." [9] As a legal term of art, however, "marketable" means more than that.

■ Clear title, to be sure, means marketable title. *Black's Law Dictionary* 228 (5th ed. 1979). In Maryland, a marketable title is one free from encumbrances and from any reasonable doubt as to its validity. *New Freedom Corp. v. Brown*, 260 Md. 383, 389, 272 A.2d 401 (1971); *Zulver Realty Co. v. Snyder*, 191 Md. 374, 384, 62 A.2d 276 (1948). Whether a title is marketable is a question of law for the court. *Berlin v. Caplan*, 211 Md. 333, 341, 127 A.2d 512 (1956). The title to the property in this case was subject to the Beneficial mortgage when Scott bought the property at the foreclosure sale September 7, 1987, and was still encumbered on December 7, 1987, when Fraidin, as trustee, received the check for $104,064.96. A mortgage which is not released of record is an encumbrance. *Black's Law Dictionary* 473 (5th ed. 1979). The title was not marketable, as a matter of law, because it was not free

---

9. Even shaky title can be propped up by appropriate insurance. Even without such bolstering, unclear and, therefore nonmarketable, title would still be worth something at an appropriate discount. Even nonmarketable items may sometimes show up in the marketplace and may sometimes even be bought. This, however, is not what is contemplated by the term "marketable."

from encumbrance. *New Freedom Corp. v. Brown,* 260 Md. at 389, 272 A.2d 401. The property was still encumbered when Scott resold the property in April, 1988. The fact that the purchasers were able to obtain title insurance does not make the title marketable and is, furthermore, irrelevant in light of Fraidin's explicit assertion that "clear title" would pass on the *day of the foreclosure sale.*

There can be a cloud upon title, notwithstanding the probability that the cloud will ultimately dissipate. In arguing for the judgment of acquittal, Fraidin's counsel insisted:

"With regard to the testimony dealing with clear title, again, it is clear that this matter is still before the Court, that the auditor's report has yet to be ratified. And if Beneficial is determined to be entitled to the funds, they will get it. If they're not entitled to the funds, they're not gonna get it. But either way, clear title has passed and will continue to pass."

To be sure, the entitlement to the funds in escrow may ultimately be adjudicated and title may ultimately pass and pass again. That, however, does not vindicate Fraidin's representation of September 7, 1987, that *"Clear* title is gonna pass *today."* That representation was a far cry from the very different representation, now urged by Fraidin as an after-the-fact palliative, that the "unclear and clouded title that is gonna pass today will, in the inexorable course of future events, become clearer and less clouded." The clarity sought by and deceptively offered to the purchaser Scott was as of the moment of the purchase.

The purchaser Scott had every right not to buy into an unanticipated lawsuit. That Scott may have been protected by title insurance no more obliterates the wrong done him than a victim's anti-burglary insurance would obliterate a burglary. If Scott had received clear title, Beneficial would never have moved, as it signaled its intention of doing in February, 1988, to foreclose on his property. That Scott might have impleaded Fraidin and/or Pacific would not have been a sure guarantee of ultimate success. The result, moreover, might have remained in doubt for months

or even years. At the very least, Scott might have been afflicted with legal expenses, with uncertainty, with a cloud upon his assets, with anxiety, with inconvenience, and with a general nuisance that he might have preferred to avoid and that he might not have risked taking on but for the assurance that he was buying "clear title."

Fraidin's convoluted reasoning that Scott would have defenses to civil actions that might be brought against him does not erase the criminal deception practiced upon him, assuring him that he would not be subjected to such civil actions. Suggesting, after the fact, ways in which one may clarify unclear title is not the same as conferring clear title in the first instance.

The claim made by Fraidin here—that notwithstanding the deception, Scott suffered no actual loss because funds were available to satisfy the undisclosed mortgage—is essentially indistinguishable from one made by the defendant in *Lane v. State,* 60 Md.App. 412, 483 A.2d 369 (1984), *cert. denied,* 302 Md. 570, 489 A.2d 1129 (1985). The defendant there had induced the victimized mortgage company (Steed) to make two loans to mortgagors that Steed would not have made but for the false impressions created by the defendant about the financial status of the mortgagors. The defendant there maintained, as did Fraidin here, that the victim suffered no loss because it was adequately protected by alternative means, to wit, deeds of trust adequate to serve as full security:

> "Appellant relies heavily on the fact that a purchase money deed of trust was transferred to Steed, securing future repayment of the fraudulently obtained loans."

60 Md.App. at 423, 483 A.2d 369. Judge Bishop, in writing for this Court, rejected such a defense, reasoning that the victim had parted with its money because of the false impression deceptively created about the status of the transaction and had not bargained for this alternative avenue of redress:

> "Steed bargained for, and had a primary right to receive, repayment pursuant to the loan documents. *What*

*it got was the burdensome, costly and necessarily risky alternative* of foreclosure." (emphasis supplied).

60 Md.App. at 424, 483 A.2d 369. The holding was that the theft by deception was a *fait accompli*, notwithstanding the fact that the "alternative" might have sufficed to make good the financial loss.

In pushing this proposition, Fraidin makes the extreme statement that even if the purchaser Scott had relied upon Fraidin's implicit representation that there were no liens on the property, the misrepresentation would not have been material. In support of this, Fraidin, in his brief, makes the bold statement:

> "It has been established since *Ivrey v. Karr*, 182 Md. 463 [34 A.2d 847] (1943) that where a mechanism exists to satisfy a non-foreclosing lienholder, the buyer cannot complain of having been misled by the trustee's failure to mention it."

Further along in his brief, Fraidin again cites *Ivrey v. Karr* as authority for such a proposition:

> "In *Ivrey*, the trustee was held not to have gone below the *Wicks* [*v. Wescott*, 59 Md. 270] standard though he failed to mention a lien while promising good title—*because a payment mechanism existed for the lien.*" (emphasis supplied).

Our readings of *Ivrey v. Karr* fail to reveal to us any such express discussion or even implicit rationale. The case involved an exception by the purchaser to the ratification of a foreclosure sale. The thrust of the challenge was that "there was no disclosure by the assignee that the first mortgage was due and demandable." 182 Md. at 473, 34 A.2d 847. The Court of Appeals rejected the challenge and affirmed the ratification of sale—on the exclusive ground that there had been full and adequate disclosure and that there had been no representations that were "in anywise misleading":

> "We have concluded from all the evidence in the case that *the disclosure*, in the advertisement and at the sale, with

respect to the status of the first mortgage and the rents, *was fair, accurate and not in anywise misleading."* (emphasis supplied).

182 Md. at 474, 34 A.2d 847. If the very different principle for which Fraidin cites this case is there, it has been too subtle for us to discern.

After having created the false impression, a legally sufficient act of deception in and of itself, Fraidin arguably compounded the initial deception by further "deception" in two of its other manifestations. Section 340(b)(1)(ii) and (iii) provide that "deception" also means "knowingly to:

. . .

(ii) Fail to correct a false impression which the offender previously has created or confirmed; or

(iii) Prevent another from acquiring information pertinent to the disposition of the property involved."

The highest bidder at a foreclosure auction does not consummate the resulting purchase with a single and decisive act. The purchase is rather a process extending over some period of time and involving several distinct stages. The auction sale took place on September 7, 1987. It was not until November 20, however, that the Howard County Circuit Court ratified the sale. Even following ratification, the ultimate settlement did not take place until December 4.

At any time between September 7 and December 4, Scott was at liberty to withdraw from the transaction if he had learned that he was suffering under a false impression as a result of Fraidin's deception. During that period, with the contemplated sale not yet wrapped up, Fraidin took pains to prevent Scott and the title company acting on Scott's behalf from learning that the property was actually encumbered by the Beneficial mortgage. At the very least, Fraidin had every reason to believe that Scott and the title company were operating under a false impression created by him and he failed to correct that false impression.

Land Title issued Scott a title insurance binder indicating that the Beneficial mortgage was unreleased of record.

Mr. Goldberg, the owner of Land Title, testified that it is not at all uncommon to discover paid but unreleased mortgages, as lenders are frequently dilatory in forwarding releases to title companies and title companies assemble releases for recording in groups. The office manager for Land Title, Patricia Horak, testified that her review of the Pacific mortgage, certifying that the Beneficial mortgage had been refinanced, led her to believe that Beneficial had in fact been paid and that the failure to record a release was a mere oversight.

Ms. Horak called Fraidin for the explicit purpose of confirming her assumption in that regard. She communicated to him not only her assumption but the premises upon which it was based, making reference to both the refinancing language of the Pacific mortgage and the tax stamps. The escrow documents had not been recorded in the Land Records and were not discovered by Ms. Horak. Fraidin, in the course of that telephone conversation, was meticulously careful neither to confirm nor to deny Ms. Horak's conclusions. He was obviously aware, however, of the false impression under which she was laboring. His deceptive conduct was in failing to correct that false impression. The false impression that there was no outstanding Beneficial mortgage, moreover, was one that he had initially created. However clever he may have imagined himself, his calculated silence spoke volumes in the ears of the law.

His deception then progressed from the realm of careful and calculated omission into at least the borderland of commission with their next exchange in the course of that telephone conversation. Ms. Horak communicated to him her belief that he, as the closing agent on the last refinancing, had possession of the release from Beneficial. When she proposed that Fraidin send her the Beneficial release so the settlement could proceed, Fraidin "agreed" to do so. Fraidin's present protestation that all he "agreed" to do was to furnish whatever release, if any, might happen to be in his possession without suggesting that there was one is so disingenuous as to beggar belief.

When the settlement finally took place on December 4, moreover, Fraidin signed a settlement statement indicating that all of the foreclosure proceeds were payable to him as trustee. There was no deduction for the Beneficial mortgage and no mention that it even existed. His silence on a critical issue was, again, pregnant.

Further evidence that Fraidin was not naively innocent of the false impression he had created and allowed to persist was his callous reaction to a telephone call from Mr. Goldberg in February, 1988. Mr. Goldberg informed him of Beneficial's intent to foreclose on the mortgage. Mr. Goldberg pointed out that it had been Fraidin's language in the Pacific mortgage and Fraidin's subsequent conduct that had led Land Title to believe that the Beneficial mortgage had been satisfied. Instead of expressing any regret, chagrin, or surprise that his oversight had somehow given rise to such an unfortunate mistake, Fraidin coldly replied, "Get yourself an attorney," and hung up the phone. That attitude was not, of course, criminal *per se*. It was nevertheless some evidence of Fraidin's state of mind with respect to the false impression.

### Legal Sufficiency: Proof of Obtaining Control

Fraidin staunchly maintains that he could not personally have been guilty of theft because he never personally obtained the stolen goods, to wit: the $114,000 that Scott was deceived into transferring. Fraidin maintains that he acted only as a trustee and was, therefore, acting at all times as an agent of the court. He maintains that the funds coming to him in his capacity of trustee were not for his personal use but for the benefit of the foreclosing Pacific Mortgage Company and possibly various creditors, including Beneficial. He reads that statute, however, too narrowly. The gravamen of theft by deception is "obtaining control by deception." § 342(b). Section 340(f)(1), in turn, defines "obtain":

"(f) 'Obtain' means:

(1) In relation to property, to bring about a transfer of interest or possession, *whether to the offender or to another.*" (emphasis supplied).

A claim similar to that made by Fraidin here was made by the defendant in *Lane v. State,* 60 Md.App. 412, 483 A.2d 369 (1984). The defendant there had engaged in deceptive conduct that induced a mortgage company (Steed) to make two loans:

"The jury could have and apparently did conclude that had appellant not engaged in these acts of deception and had Steed been aware of the financial stati of the real purchasers, Steed would not have parted with its money. From this fact, the jury could fairly infer that appellant used deception to obtain control of the property of Steed."

60 Md.App. at 421, 483 A.2d 369. The defendant there, as Fraidin here, adamantly insisted that *he* could not have been guilty of theft by deception because *he* never obtained the money. The money that was the subject of the theft had been obtained by *others,* the mortgagors themselves who, coincidentally, had every *bona fide* intention of repaying the loans. Judge Bishop pointed out that the defendant was imparting far too narrow a meaning to the verb "obtain" within the contemplation of the theft statute:

"That the checks were issued to the purported 'home buyers' and not to appellant is irrelevant under the statute. ' "Obtain" means: (1) in relation to property, to bring about a transfer of interest or possession *whether to the offender or another* ...' Art. 27, § 340(f)." (emphasis in original).

*Id.*

Indisputably, Fraidin brought about "a transfer of interest or possession" of Scott's $114,000. That the immediate beneficiary of the deceptive transfer would have been the Pacific Mortgage Company, of which Fraidin was a co-owner, is of no particular significance, except insofar as it coincidentally reveals a motive for Fraidin's actions. There

would still have been a theft by deception even if the beneficiary of the transfer had been the International Red Cross or the Boy Scouts of America or, for that matter, the Circuit Court for Howard County. A property owner such as Scott has the right not to be deceived into parting with his property regardless of whether he loses it to the most avaricious of pettifoggers or to the noblest of philanthropies. In either event, there would be by the clear terms of the statute a theft by deception.

We hold that the evidence in this case was legally sufficient to permit a jury fairly to infer that Fraidin was guilty of theft by deception. Judge Sybert was, therefore, correct in submitting the case to the jury.

### The Civil Order Removing Fraidin as a Trustee and the Trusteeship Issue Generally

The appellant maintains that Judge Sybert erred by allowing into evidence Judge Fischer's civil order removing him as trustee. The appellant had filed a motion *in limine* to exclude the order, which motion was denied. Judge Sybert ruled that the State could introduce evidence of the order, but only if the defendant first raised the trusteeship issue. Defense counsel objected, but nonetheless promptly raised Fraidin's status as a trustee in his opening statement. The following exchange indicates what defense counsel was doing and what the State was seeking to counteract:

"Mr. Warfield [Prosecutor]: Your Honor, uh, I would submit to the Court that on the basis of Mr. Cardin's opening statement that the issue that was discussed prior has been clearly opened. I point to the fact that [Fraidin's] role as a trustee was pointed out to the jury on numerous occasions, including the statement that as a trustee he followed the rules, he followed the guidelines, he, uh, everything he did was consistent with his obligations as a trustee. That is, as a matter of fact, not true. Because he was found by the court to not be within

those bounds and removed. I think that counsel by his opening statement has put me in a position to, in my—
The Court: So, I'm gonna have to open it up.
Mr. Cardin: Well, but, but—I have no problem with the idea that he was a trustee. I don't think the fact that he was removed as trustee is valid. That's what I was trying to—
The Court: Mr. Cardin, I disagree with you. You mentioned that he did everything right, everything's turned in, everything else, as trustee. That's not correct. The record doesn't bear that out. Wasn't he removed as trustee?
Mr. Cardin: Well, then we have to go into all the evidence that the judge used."

The civil order removing Fraidin as trustee was not used to prove his guilt or innocence, or to establish as a fact an element of the crime of the theft. The order was used instead to counter the assertions made by the appellant that he was acting properly as a trustee, and that the court approved his actions. As noted by Professor McLain, courts are likely to allow extrinsic evidence of collateral matters to impeach when a "witness has made 'sweeping claims,' which create a highly misleading favorable impression." L. McLain, *Maryland Evidence*, § 607.4 at 51 (1987 & Supp.1990). The appellant made such "sweeping claims" here, baldly asserting as gospel truth that everything that Fraidin did was at the express direction of or with the express approval of the court.

Quite aside from the fact that the appellant opened the door to this necessary correction of his sweeping but incorrect assertions, the order itself turned out to be inconsequentially cumulative. As Fraidin's counsel had predicted, "Well, then we have to go into all of the evidence that the judge [Judge Fischer] used." As relevant background to Fraidin's deceit in this case, all of the preliminary matters such as the Easterlings' mortgage from Beneficial; the second mortgage or refinancing mortgage, whichever it was, with Pacific; the attempted rescission of the loan from

Pacific by the Easterlings; the inert status of the escrow account for several years; and the ultimate foreclosure by Pacific were all fully developed in the criminal trial. Everything that had been before Judge Fischer in the civil case was independently developed again before the jury in the criminal case. After hours of independent examination and cross-examination of the witnesses on all of these issues, the fact of the earlier order was a relatively inconsequential redundancy.

In a larger sense, the whole issue of Fraidin's removal as a trustee is a "red herring." His argument might have more merit if trusteeship were, indeed, a defense to theft, which it is not. The appellant maintains that he was merely acting in his capacity as trustee, and therefore could not have personally violated the law within the meaning of the theft statute. We disagree. The logical result of this argument would be to immunize any trustee from criminal prosecution merely because of his or her status as a trustee, leaving only civil remedies to punish the wrongdoer.

In a desperate effort to stave off the inevitable conclusion that he was guilty of deceptive conduct, Fraidin argues, in reply brief as at trial, that that provision of the theft statute prohibiting "the concealment of liens *cannot* apply to foreclosure trustees in contexts like the present one" and that "trustees are permitted to remain silent on title ... even when they have actual knowledge of competing liens." At trial, Fraidin offered as precedential support for this strained proposition two Maryland cases, both decided well before the promulgation of the criminal statute in issue, dealing with the very different subjects of equitable responsibilities and civil fraud, respectively.

One of those, *Thruston v. Devecmon*, 30 Md. 210 (1869), is bizarrely inapposite. It is an equity case touching upon the duty of trustees to make an accounting but not remotely alluding to the issue before us here.

The other case, *Savings Banks Retirement System v. Clarke*, 258 Md. 501, 265 A.2d 921 (1970), is also inapposite,

both factually and legally. It involved, to be sure, a trustee who was found to be free of civil fraud. That holding, however, was based upon the fact that "[o]ne of the required elements for relief against fraud is that the person allegedly defrauded *relied* upon the false representation," (emphasis in original), 258 Md. at 506, 265 A.2d 921, and that "the plaintiffs did not rely upon the alleged representation that the title ... was free of liens." 258 Md. at 507, 265 A.2d 921. The clear import of the opinion, however, is that if the plaintiffs had, indeed, relied upon the misrepresentation of the trustees, the civil fraud would have been established:

> "It may be added that merely because the plaintiffs had access to the land records where the deed of trust of April 7, 1964, was recorded would not have prevented the plaintiffs from relying upon the alleged misrepresentation if they had seen fit to do this."

*Id.* In the present case, the evidence clearly permitted the conclusion that Scott, before parting with the purchase money, did rely upon the misrepresentations, explicit and tacit, of Fraidin. The *Clarke* opinion did not allude to the proposition for which it was cited—that a law prohibiting deceptive concealment would not apply to a trustee at an auction sale.

■ *Savings Banks v. Clarke* is not simply inapposite factually; it is also inapposite legally. Detrimental reliance by the victim is an essential element of civil fraud. Detrimental reliance by the victim is not, however, a necessary element of criminal theft based upon deception. In *Cardin v. State,* 73 Md.App. 200, 222–224, 533 A.2d 928 (1987), Judge Bloom traced definitively the legislative history of the theft statute and the specific amendment, adopted at the suggestion of the Attorney General, that removed detrimental reliance as a necessary element. The conclusion of this Court was unequivocal, at 73 Md.App. 222, 533 A.2d 928:

> "Finally, we do not interpret Maryland's consolidated theft statute as requiring detrimental reliance as an ele-

ment of the crime. Both the plain language of the statute and its legislative history conclusively demonstrate that detrimental reliance on the part of the victim is not an element of theft by deception."

After tracing the legislative evolution of this part of the statute and quoting from the Joint Subcommittee on Theft and Related Offenses with respect to the amendment, we held, at 73 Md.App. 224, 533 A.2d 928:

"Thus, the General Assembly adopted the Attorney General's suggestion and specifically amended the statute to eliminate any possible inference that reliance was an element of theft by deception by deleting the language 'obtains by deception' and substituting 'uses deception to obtain and does obtain.' The intent of the legislature being readily apparent not only from the very words of the statute but also its legislative history, we reject Cardin's claim that detrimental reliance is an element of theft by deception under the statute." [10]

Perhaps sensing that he cannot prevail with the notion that a trustee has the prerogative of total concealment, Fraidin cites *Wicks v. Westcott*, 59 Md. 270 (1883) for the slightly lesser proposition that a trustee will "not [be] held to a high degree of precision in what statements he does make about title." We do not read the case to stand for a standard nearly so lax as that urged by Fraidin. In a challenge by a judgment creditor to the ratification of a sale in that case, the charge was made that the trustee, by virtue of imprecise and misleading representations, had unduly depressed the apparent value of the subject property and had thereby failed to procure an adequate sale price. The Court of Appeals agreed that the trustee had indeed so failed and reversed the trial court's ratification of the sale. In doing so, the Court of Appeals did, to be sure, begin with

---

**10.** Even if it were the case, however, that detrimental reliance were required, Scott testified affirmatively that he would not have gone forward with the purchase if he had known the true status of the Beneficial mortgage.

the general statement relied upon by Fraidin here, from 59 Md. at 277:

> "As a general rule, we do not think it is the duty of the assignee or trustee, in selling property, upon which prior incumbrances rest, *to ferret out* the exact state of such liens, and ascertain how much, if any, may be due upon them. The rule of *caveat emptor* excludes such rigid exaction of a trustee." (emphasis supplied).

Even that general language, of course, would be of no avail to Fraidin for he was not called upon "to ferret out" anything. He already knew about the Beneficial mortgage and about its unpaid status, without any necessity of ferretting. It was his own title company, after all, that still held the Pacific funds in escrow. It was his co-owner of the title company who had not acted on the Easterlings' two-year-old request to challenge the Beneficial mortgage, ostensibly the reason the funds were originally placed in escrow in the first place.

After making the general statement, however, *Wicks v. Westcott* turned in the very different direction of its ultimate holding, at 59 Md. at 277:

> "[I]f he was not bound to inquire or make any statement respecting the amount of arrears, *the trustee was bound, if he undertook to make any statement* respecting it, *to be sure that the statement* he did make *was,* at least, *approximately accurate, and not in anywise misleading.*" (emphasis supplied).

In terms of what will *not* pass muster as "approximately accurate" and in terms of what *will* be struck down as "in anywise misleading," the Court of Appeals held that the sale price had been erroneously depressed by the trustee's representation that the encumbrance upon the property could be as high as $4,000 when, in fact, it was but $2,700. "The statement made by the authority of the assignee was therefore *clearly misleading.*" (emphasis supplied). 59 Md. at 278. The holding, at 59 Md. 278–279, did not establish the permissive and latitudinarian standard for which Fraidin cites it:

"Manifestly *the bidders were entitled to all the information* on the subject *which he had,* and when he gave notice of that judgment and mortgage, *he ought to have stated all he knew* about them. It was most important information to bidders, and how far that information, which would have helped bidders to form some better idea as to the sum they would have to pay in addition to what was bid, might have operated to induce more competition, it is impossible to tell. The unexplained statement of the fact of such liens was calculated to depress the sale." (emphasis supplied).

Notwithstanding its citation by Fraidin, *Wicks v. Westcott* supports rather the counterstandard that Fraidin, even as a trustee, owed the bidders here "all the information on the subject [of the Beneficial mortgage] which he had" and that "he ought to have stated all he knew about [it]." This he most clearly did not do.

Even assuming Fraidin's status as a trustee generally to have remained intact, any violation of the criminal law was beyond the scope of that status and was not as an agent of the court. Although Fraidin may have operated under the authority of the court when he called for the foreclosure sale and when he took custody of the check from Scott, he was not operating under the authority of the court when he failed to disclose the existence of the Beneficial mortgage in direct contravention of the law. He was not operating under the authority of the court when he asserted, "Clear title is gonna pass today." He was not operating under the authority of the court when he failed to correct Ms. Horak's false impression that the nonrelease of the Beneficial mortgage was a mere clerical oversight. He was not acting under the authority of the court when he agreed to forward to Ms. Horak the release she supposed to exist. In short, he was not acting under any authority from the court when he violated the theft statute. His status otherwise as a trustee affords him no protection in this regard.

## The Relevance of Antecedent Events

The appellant claims that evidence of all transactions that occurred in this case before Scott entered the picture at the auction sale on September 7, 1987, was irrelevant and prejudicial to his case. That evidence unquestionably was prejudicial to his defense but properly so. The issue of logical relevance or probative force is a simple one. The inquiry is whether the evidence will assist the fact finders in their search for truth.

In that regard, even the members of this Court would have found this case almost unintelligible if *we* had not had the benefit of the antecedent history. The events at and shortly after the foreclosure sale would make no sense without knowledge of the Beneficial mortgage, of the relationship between the Easterlings and Pacific, of the attempt by the Easterlings to rescind the Pacific loan, and of the subsequent inactivity followed by the foreclosure of the Pacific mortgage. Without it, there would be no apparent motive. *A fortiori*, a jury of laymen would find this story incomprehensible if they received it only in part. If it was helpful, let alone indispensable, to their understanding of the case, it was relevant and admissible.

To explain the logical relevance of the necessary background material that makes comprehensible what would otherwise be incomprehensible, we will assume the role for a few paragraphs of a lay narrator recounting a story that could permissibly be deduced from these tangled events.

The permissible picture emerges of Fraidin as an extremely clever manipulator of complicated commercial transactions who, if he did not initially have larceny in his heart, at least had avarice in his heart. To feed that avarice, he created at-times labyrinthine confusion. He then sought to exploit that confusion to his own advantage. Although arguably intending to stay carefully within legal limits, he would skirt perilously close to the line. If in such a maneuver he inadvertently stepped out of bounds and the

referee blew the whistle on him, it is not the occasion for any great outpouring of sympathy.

Fraidin's mortgage company, Pacific, acquired the mortgage on the Easterling property, ostensibly so that the Easterlings could use the money to refinance the Beneficial mortgage. Fraidin persuaded Mr. Easterling, however, to place the funds in escrow and to challenge the Beneficial mortgage. Shortly thereafter, Mr. Easterling thought that he had rescinded this mortgage arrangement with Pacific. He was lulled into a sense of security in that regard in that he continued to receive mortgage payment bills from Beneficial while receiving none from Pacific. At that point, Fraidin, through his company, Pacific, had acquired a mortgage on the Easterling property without laying out anything in return. No funds were ever disbursed to Beneficial. No negotiations moved forward with Beneficial as to the amount owed them. No excess loan funds were ever disbursed to the Easterlings.

When the Pacific mortgage was foreclosed, therefore, Fraidin's mortgage company, Pacific, had for the moment at least acquired something for nothing. Efforts by Beneficial to collect from either the auction proceeds or the earlier escrow account were rebuffed with a curt, "Call your lawyer," or "The check is in the mail."

With luck or enough confusion, Fraidin and his various manifestations might have gotten away with everything. At the very least, they might have arranged a settlement, thereby keeping some of the proceeds that had never been earned. Fraidin at times operated through his mortgage company, Pacific. At times, he operated through his title company, Gibraltar. However many hats he wore, Fraidin's was the single brain that masterminded the operation.

From such a version of events, which the evidence in this case permitted, the conclusion that Fraidin was guilty of theft by deception was eminently reasonable.

### Claim of Right and Honest Belief Defenses

■ Although buried in the middle of a cluster of sub-contentions apparently dealing with the legal sufficiency of the State's evidence, the appellant baldly claims that he was denied the opportunity "to assert claim of right and honest belief defenses." He looks to § 343(c)(1) and (2) as the source of those defenses. Although a cursory analysis strongly suggests that the appellant, on the facts of this case, does not remotely qualify for either of the two defenses, it is not necessary to engage in a deeper analysis of the merits.

It is worth noting, coincidentally, that the appellant did not take the stand in his own defense. It is extremely difficult to generate a genuine jury issue with respect to either a "claim of right" or an "honest belief" without offering some evidence as to the appellant's actual state of mind in those regards, as well as some evidence of the basis for such a state of mind.[11]

The short answer to the contention is that the appellant does not tell us in what way he was prevented from asserting these defenses. The two pages of argument in this regard are little more than a bald conclusion. If defense witnesses were called to establish these defenses and precluded from testifying, the appellant points to no place in the record where such a thing occurred.

If, on the other hand (or in addition), the appellant is claiming that specific jury instructions in these regards

---

11. In his brief two pages of argument, the appellant cites one case, *Sibert v. State,* 301 Md. 141, 482 A.2d 483 (1984). In that case, the Court of Appeals held that no genuine jury issue had been generated with respect to the claim-of-right defense but that a genuine jury issue had been generated with respect to the claim-of-right defense but that a genuine jury issue had been generated with respect to the honest belief defense. In considering specifically whether the defendant there had crossed the threshold of mounting a *prima facie* case in that regard, the Court pointed out that the defendant himself had testified fully and specifically with respect to the circumstances and his state of mind and had, moreover, produced three witnesses to corroborate his account of the transaction.

were requested by him and denied, the appellant does not furnish us with the text of the requested instructions or any reference to the discussion and ultimate ruling made with respect to them.

The claim, even to be entertained, must be that Judge Sybert made an erroneous ruling in some specific regard. There is nothing specifically before us on this issue.

### Speedy Trial

Although the appellant was indicted on February 24, 1988, the indictment was not served on him until March 17. He was initially scheduled for trial in the District Court for Howard County on June 15, 1988. There was nothing out of the ordinary in that scheduling.

Notwithstanding the fact that he was unrepresented by counsel and notwithstanding the complexity of the case, Fraidin indicated to Judge Vaughn that he was ready to proceed with trial. It was for the very next day, however, that the civil case, postponed nine days earlier by Judge Kane's recusal, had been rescheduled before Judge Fischer. The State requested a postponement of the criminal case for two reasons. One was that the civil matter "may or may not have some bearing" on the criminal charges. The other reason was that the case would obviously take more than one hour to try and the understanding in the Howard District Court was that any case requiring more than one hour would be set specially rather than receive routine handling in the regular assignment. For the combination of reasons, Judge Vaughn granted the State's request for a postponement with the caveat that no further postponements would be granted.

The criminal case was reset in the District Court for September 28 before Judge Sadler. Fraidin was still unrepresented by counsel. Despite admonitions from the bench about the perils of proceeding unrepresented, Fraidin indicated that he was ready to proceed *pro se*. Ascertaining that Fraidin had expressly waived his right to counsel under

Maryland Rule 4–215, Judge Sadler asked Fraidin to elect between a court trial and a jury trial. Fraidin insisted that he wanted to raise a preliminary motion before making that election. Judge Sadler ruled, "If you want to pray a jury trial, you will take your preliminary motion down to the Circuit Court. If you want a trial in this Court, then I will hear your motion and we will proceed to trial." Fraidin elected a jury trial but protested that Judge Sadler was wrong in not having entertained his preliminary motion.

Any delays that occurred after that at the Circuit Court level were either for neutral reasons or at Fraidin's specific request. The case was set in for trial in the Circuit Court on October 20, just twenty-two days after the election of jury trial had been made in the District Court. The scheduled trial on that day was postponed at the request of the appellant. Fraidin, indeed, raises no issue with respect to the post-September 28 time period. He states in his brief, "When the criminal case reached the Circuit Court, there were additional delays *which are not appealed from here.*"

The appellant's entire contention is based upon the single postponement from June 15 to September 28, 1988. It is unnecessary to belabor this analysis by looking to the four factors spelled out in *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). Fraidin argues the single factor of prejudice. Even that he argues in only one specific regard:

> "The result of the delay of trial was that Mr. Fraidin was obliged to defend himself after rather than before Judge Fischer had acted, after he himself had been forced to testify, and after the State had enjoyed a full chance to digest the civil trial transcript."

He argues that his defense was prejudiced because he was required to go to trial on the criminal charges after Judge Fischer had made his ruling, removing him as a trustee, rather than before that ruling had been made. He misperceives totally what "prejudice to a defense" means within the contemplation of speedy trial law.

The Supreme Court has made it clear that the most significant aspect of prejudice to a defendant is impairment of the defense case. This contemplates such things as defense witnesses becoming unavailable and memories becoming faulty. It involves the erosion of a defendant's ability to defend himself upon the merits. The focus is constantly upon *the merits*. The Constitution is not concerned with the merely tactical disadvantage that may accrue because the State's case has been enhanced. The law's ideal, rather, is that the merits of the case may be presented as fully as possible by both sides. A defendant has no constitutionally vested interest in the weakness of the State's case. That is mere gamesmanship. The strengthening of the State's case (we are not intimating that any such strengthening happened here) does not erode in any way a defendant's case upon the merits.

On the specific grounds urged by the appellant here, we see no infringement of the Sixth Amendment right to a speedy trial.

### Non–Recusal of Judge Kane

Once again, Fraidin is blithely indifferent to every procedural requirement of appellate review. He complains that Judge Kane erroneously failed to recuse himself from presiding over the preliminary motions hearing on March 2, 1989.[12] The short answer is that Fraidin never asked him to.

When the civil aspect of this case was brought before Judge Kane on June 6, 1988, Judge Kane recused himself. He stated that there might be a conflict of interest in hearing the case because his first cousin, Joseph Goldberg (owner of Land Title), was to be a material witness. It was

---

12. The appellant's brief charges Judge Kane with having made erroneous rulings on both the speedy trial issue and the Bill of Particulars issue. The demand for a Bill of Particulars was not even filed until March 23, three weeks after the hearing before Judge Kane had concluded. A separate hearing on that issue was conducted on May 18. Presiding over that hearing was Judge Sybert, not Judge Kane.

then that Judge Fischer took over responsibility for that case.

When on March 2, 1989, Judge Kane found that the motions hearing in Fraidin's criminal case had been set before him, he promptly alerted counsel for both sides. The prosecutor pointed out that Goldberg was not to be a witness with respect to any of the preliminary matters and that the substance of the preliminary matters, moreover, did not relate to Goldberg in any way. Judge Kane pointed out that under Maryland Rule 1231, Canon 3 C(1)(d), he was not technically required to recuse himself even from the trial upon the merits, because the degree of relationship was not sufficiently close. In an excess of concern, however, Judge Kane solicited the response of both counsel to his presiding at the hearing. Fraidin's counsel explicitly stated that he had no objection to Judge Kane's presiding over the hearing:

"The Court: I don't believe there's any statutory prohibition against me hearing the case, I just happened to be reading the statement of charges and it mentioned the name that has some significance and I just alert Counsel to it, that's all. I assume I can decide whether or not the, the statement of charges set forth a charge—

Mr. Warfield: That's the—

The Court: And not influenced by the fact that somebody's name is mentioned in the statement of charges.

Mr. Warfield: I would submit that that's true, a true statement.

The Court: And there's no statutory prohibition against me hearing it, I just want to let you know what caught my attention.

Mr. Warfield: OK.

The Court: I mean, *is there some concern on anybody's part* that—

Mr. Warfield: Not on the State's part and—

The Court: *The Defendant's part?*

Mr. Cardin [Defense Attorney]: *No your Honor."* (emphasis supplied).

In reply brief, the appellant makes the feeble and almost self-damning response that "at that point it was unlikely that Mr. Fraidin's counsel could have comprehended what he was agreeing to." Fraidin himself, of course, had been present nine months earlier when Judge Kane disqualified himself from presiding over the civil trial on June 6, 1988. Fraidin's counsel had been in the case since December 15, 1988, over three months prior to the preliminary hearing before Judge Kane in the criminal case. It is far more likely that skilled and competent counsel simply concluded that there was no purpose to be served in asking Judge Kane to disqualify himself from ruling on the preliminary motions.

There is self-evidently nothing in this regard preserved for appellate review.

### Bill of Particulars

■ The appellant complains that the hearing judge erroneously denied his demand for a Bill of Particulars. The controlling rule of court on the subject is Maryland Rule 4–241. Quite aside from the fact that there is no sanction provided against the State for noncompliance with the rule, *Grant v. State,* 55 Md.App. 1, 30–31, 461 A.2d 524 (1983), and that a defendant is not entitled to a Bill of Particulars as of right but only in the discretion of the trial court, *Pearlman v. State,* 232 Md. 251, 261, 192 A.2d 767 (1963), *cert. denied,* 376 U.S. 943, 84 S.Ct. 797, 11 L.Ed.2d 767 (1964), either one of which might be fatal to Fraidin's cause here, the easy answer to the contention is that Fraidin was not entitled to particulars because he did not make a timely demand for them. Rule 4–241(a) provides:

*"Within 15 days* after the earlier of the appearance of counsel or the first appearance of the defendant before the circuit court pursuant to Rule 4–213(c), the defendant may file a demand in circuit court for a bill of particulars. The demand shall be in writing, unless otherwise ordered

by the court, and shall specify the particulars sought. (emphasis supplied).

Fraidin's counsel entered his appearance on December 15, 1988. The time within which a Bill of Particulars could have been demanded extended through December 30, 1988. The demand was not filed until March 23, 1989, almost three months late. Under the explicit provisions of the rule, Fraidin had, therefore, no entitlement to a Bill of Particulars.

### Prior Inconsistent Statement

 The appellant finally asserts that Judge Sybert erred by refusing to instruct the jury regarding a prior inconsistent statement allegedly made by Mr. Scott. We will not consider the contention, however, because the appellant has failed to specify in his brief the particular statement(s) he is challenging, and has failed to provide argument in support of his position. Md.Rule 8–504(a)(5); *Oaks v. State*, 83 Md.App. 1, 8–9, 573 A.2d 392 (1990). Appellant makes only a broadly worded and somewhat confusing statement in his brief:

"The credibility of Mr. Scott was very much at issue in this case. The denial of a prior inconsistent statement instruction was indicated, because such a statement had been proved. It was relevant to his credibility."

This quoted passage was the sum total of the appellant's argument on this issue. In his reply brief, appellant again has failed to point out to this Court the point at which Scott was allegedly impeached, and again has failed to argue the law in support of his position:

"The requested instruction on Mr. Scott's prior inconsistent statement would have focused the jury's attention on the fact that Mr. Fraidin was impeaching Mr. Scott as a witness. Even though one version of Mr. Scott's story did favor Mr. Fraidin, the inconsistency did show Mr.

Scott in a true light which the jury should have had called to its attention."

The issue is not adequately presented for appellate review.

JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.